843 A.2d 344 (2004)
367 N.J. Super. 427
Marilyn STENEKEN, Plaintiff-Respondent,
v.
Gary STENEKEN, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 23, 2004.
Decided March 15, 2004.
*345 Todd M. Sahner, Roseland, argued the cause for appellant (Marcus, Brody, Kessler, Sahner & Weinstein, attorneys; Mr. Sahner, on the brief).
Bonnie C. Frost, Denville, argued the cause for respondent (Einhorn, Harris, Ascher, Barbarito, Frost & Ironson, attorneys; Ms. Frost, on the brief).
Before Judges HAVEY, PARRILLO and HOENS.
The opinion of the court was delivered by PARRILLO, J.A.D.
In this matrimonial action, defendant Gary Steneken appeals from a February 24, 2003 order of the Family Part, after our remand, increasing alimony to $5,500 per month, $1,500 more than the amount originally set by the trial judge in the February 14, 2000 final judgment of divorce, *346 and awarding plaintiff Marilyn Steneken counsel fees. The novel issue raised in this appeal is whether it is impermissible "double counting" to value defendant's business based on his reasonable, rather than actual, compensation and then to calculate alimony based on the same excess salary that was added back to business income, thus increasing the value of the corporate asset for which plaintiff already received her share in equitable distribution.
This is the second appeal in this matter and the facts need to be stated only briefly. The parties were married on August 22, 1971 and separated approximately twenty-four years later on November 23, 1995. Three children were born of this marriage, two of whom, Krisann and Ryan, were emancipated at the time of trial, and the third, Lee, was born on July 27, 1979. A complaint for divorce was filed on April 14, 1997.
The largest marital asset subject to equitable distribution was defendant's interest in Esco Corporation (Esco), a closely-held company in which defendant was the sole shareholder and operator. We recount a description of this business, as well as the marital lifestyle and the parties' financial resources, from our earlier opinion:
Esco manufactures optics, optical components and optical filters. Plaintiff's uncle, Mike Esposito, was a founder and an owner of Esco in 1971 when defendant began working there while he was still a college student. Following his gradation from college, defendant went to work with Esco on a full-time basis. The principal owner, president and operator of Esco was Fred Stuhler. Esposito died in 1976 and Stuhler purchased his interest in Esco from Esposito's widow. Defendant purchased Esco from Stuhler in November 1982 for the sum of $650,000, plus $150,000 as consideration for a non-competition clause agreed to by Stuhler. The purchase was financed by a promissory note and bank loan, with the marital domicile used as collateral. Defendant became Esco's president; plaintiff was not a shareholder, although she was involved with several aspects of the business.
Plaintiff testified to a lavish marital lifestyle that included living in a 3500 square-foot, four-bedroom colonial home in Oak Ridge, the use of luxury vehicles and a sail boat, numerous out-of-state and out-of-country vacations, and the receipt of expensive jewelry and gifts. Defendant's testimony did not dispute many of the actual facts concerning the lifestyle; rather, he contended many of the trips were business related.
Plaintiff, a college graduate, began working after Krisann, the oldest child, graduated from college, ultimately taking a full-time position as a science teacher in 1991. Her 1999 gross salary from the Sparta Township Board of Education was $42,465. The wife testified she was considering pursuing a master's degree which would likely significantly raise her salary.
Defendant's gross salary was $188,975 in 1995, $207,707 in 1996 and $198,535 in 1998. Defendant also testified he annually received perquisites (perks) ... although they had decreased significantly due to the poor financial condition of the business. In 1998, defendant received $27,000 in perks but testified they averaged less than $16,000 each year since 1995 and were only $12,000 to $14,000, annualized, at the time of trial.
....
There were significant differences in the expert testimony presented by the parties at trial concerning the value of Esco and defendant's effective cash flow *347 therefrom. Plaintiff called three expert witnesses. Christopher Sullivan, a real estate appraiser, testified that the value of Esco's real property was $400,000 as of March 19, 1999. Rufino Fernandez, a business evaluation expert, testified that the value of Esco, including the real estate, was $915,000 as of December 31, 1996. Linda Schaeffer, an accountant, testified that husband had an effective cash flow from Esco of $330,072 in 1998, which included the salaries of the children and all perks; if those were not included, she found his gross income from Esco to be approximately $200,000 in 1998.
Defendant's business evaluation expert, Kenneth Arlein, testified that the value of Esco was $568,742 as of April 14, 1997; with the value of the real estate and an existing mortgage added in, Arlein found the value of Esco to be $768,000 as of that date.
[Steneken v. Steneken, A-3882-99T5 (App. Div. April 10, 2002) (slip op. at 2-5).]
In his November 18, 1999 decision, the trial judge accepted the business valuation of defendant's expert who used the income, or capitalized earnings, approach. Arlein calculated a capitalization rate of twenty-four percent for Esco and applied that rate to Esco's average annual business income, which was adjusted to reflect a "reasonable" annual salary for defendant of $150,000. This figure was lower than defendant's actual compensation of $207,797 in 1996, the year immediately preceding the filing of the divorce complaint. Thus, Arlein added $57,797 to Esco's average annual income for that year. After making other adjustments[1], Arlein calculated Esco's adjusted total income for the years 1992 through 1996, computed an average income, subtracted Esco's income tax liability, and applied the twenty-four percent capitalization rate. This calculation yielded a $568,742 value for Esco, to which he added the same valuation for Esco's real estate as that established by the appraiser in September 1993$300,000and subtracted a $100,000 note liability. The total value of Esco calculated by Arlein was $768,000.
The trial judge then distributed thirty-five percent of this value, or $268,800, to plaintiff. Defendant was awarded sole ownership of Esco and, in light of other distributions made, was directed to buy out plaintiff's distributive share for $142,600, to be paid with interest over a period of six years. Using the same compensation level, $150,000, deemed "reasonable" for purposes of valuing Esco, as opposed to defendant's actual income, the trial judge awarded plaintiff alimony in the amount of $48,000 per year. A final judgment of divorce was entered on February 14, 2000.
Plaintiff appealed from the amount of permanent alimony and equitable distribution awarded to her, as well as from the determination of Esco's valuation. We affirmed the valuation of Esco and plaintiff's thirty-five percent distributive share therein, but remanded the alimony determination. Steneken, supra, (slip op. at 25, 27). As to the latter, we stated:
[T]he judge determined that defendant's salary for alimony purposes was $150,000 per year, the same figure testified to by Arlein as constituting a reasonable compensation figure for defendant for use in valuing Esco for equitable distribution purposes. Arlein *348 specifically testified that $150,000 was used as "reasonable compensation" for the CEO of a company of Esco's size and complexity and was not meant to constitute a determination of defendant's actual income.
We cannot conduct a meaningful appellate review of the alimony conclusion in the absence of sufficient findings of fact and conclusions of law, since we are unable to reconcile or determine an adequate basis for the conclusion as to defendant's income, nor determine the basis for the ultimate conclusion of plaintiff's entitlement to alimony in the amount of $48,000.

[Id. at 26-27.]
On remand for a determination of the alimony award, the trial judge interpreted our decision as meaning that he erred in "utilizing that figure [$150,000] when it came time to make a determination as to how much alimony, if any, plaintiff was entitled to receive[,]" and as requiring alimony based on defendant's actual yearly income. With that understanding, the judge reviewed the financial information in the record, received additional evidence of defendant's gross income in 2001 ($262,555) and projected income in 2002 ($252,401), and reexamined the parties' marital lifestyle (upper middle class), plaintiff's needs ($80,000 per year), and defendant's ability to pay (based on actual income) against that backdrop. As a result, the judge increased plaintiff's alimony award to $5,500 per month, or $65,000 annually. He reasoned in part:
The Court has reviewed all of the needs and again the testimony as to what the Plaintiff would have to pay once she loses the benefits of the perks. Taking that into consideration, it appears that the difference in what the Plaintiff was spending before and what she would now have to spend as a result of the Divorce is approximately $5,000.00 per month depending upon how the expenses are analyzed. In further examining the needs of the Plaintiff and taking into consideration her net salary after taxes, it would appear that she would have a short fall of approximately $65,000.00 per year.
Defendant moved for reconsideration, arguing that use of his actual income improperly resulted in "double dipping" since his excess earnings beyond his "reasonable compensation" were considered in valuing the business, of which the wife received a thirty-five percent distributive share. The judge denied defendant's motion and granted plaintiff's motion for counsel fees in the amount of $2,500. This appeal follows.
As a threshold matter, we restate basic tenets of alimony law that must guide resolution of the issue presented. Alimony, whether it be pursuant to a property settlement agreement or by court order, should attempt to provide a dependent spouse with the wherewithal to "maintain a lifestyle that is reasonably comparable to the standard of living enjoyed during the marriage." Crews v. Crews, 164 N.J. 11, 17, 751 A.2d 524 (2000); Boardman v. Boardman, 314 N.J.Super. 340, 344, 714 A.2d 981 (App.Div.1998). As the Supreme Court has repeatedly stated, "the primary purpose of alimony is to permit the [dependent] spouse to share in the accumulated marital assets to which he or she contributed." Konzelman v. Konzelman, 158 N.J. 185, 195, 729 A.2d 7 (1999); Mahoney v. Mahoney, 91 N.J. 488, 501-02, 453 A.2d 527 (1982); Lepis v. Lepis, 83 N.J. 139, 151, 416 A.2d 45 (1980).
The award of spousal support is broadly discretionary. This discretion is codified in N.J.S.A. 2A:34-23(b) which provides that "[i]n all actions ... for divorce ... the court may award ... permanent alimony; *349 rehabilitative alimony; limited duration alimony or reimbursement alimony to either party." (Emphasis added). Of course, the exercise of this discretion is not limitless. In itemizing the thirteen specific criteria to be considered in fixing alimony, the statute sets guidelines and objective standards which frame the exercise of the court's discretion. Such factors include, among other things, the actual need and ability of the parties to pay; the duration of the marriage; the age, physical and emotional health of the parties; their standard of living throughout the marriage; their earning capacities; and their contributions to the marriage. N.J.S.A. 2A:34-23(b). Alimony provides for support of the dependent spouse usually from current income of the supporting spouse. Bonanno v. Bonanno, 4 N.J. 268, 275, 72 A.2d 318 (1950).
The goal of equitable distribution, on the other hand, is to effect a fair and just division of marital assets. Rothman v. Rothman, 65 N.J. 219, 228-29, 320 A.2d 496 (1974). Here too, the Legislature has enumerated various factors, N.J.S.A. 2A:34-23.1, which although not dispositive, are to be used in concert with the facts of each case in the determination of equitable distribution. Painter v. Painter, 65 N.J. 196, 212, 320 A.2d 484 (1974). Nevertheless, the manner of distribution, as with the determination of alimony, remains within the broad discretion of the trial court. Borodinsky v. Borodinsky, 162 N.J.Super. 437, 443, 393 A.2d 583 (App.Div.1978).
Although equitable distribution and alimony are not the same and serve different purposes, they are closely related. Painter, supra, 65 N.J. at 218, 320 A.2d 484; Lavene v. Lavene, 162 N.J.Super. at 198, 203, 392 A.2d 621 (App.Div.1978). In fact, a trial court in setting alimony is required to consider the property division. N.J.S.A. 2A:34-23(b)(10).[2]
Extending the latter principle to this case, defendant argues that plaintiff's distributive share of the corporate asset, which reflects an increased value derived from retention of his "excess earnings," removed those excess earnings from the alimony calculus. Otherwise, he urges, plaintiff will receive the benefit of his excess income twiceonce upon equitable distribution and again for spousal support. This, according to defendant's reasoning, is impermissible "double dipping" or "double counting". The argument has superficial appeal but is inherently flawed.
Stated generally, the "rule" upon which defendant relies prohibits the double counting of a marital asset once in property division and again in the alimony award. The supposed unfairness or perceived evil against which the rule aims is that double counting allows the alimony recipient to dip twice into the same asset. Thus, "[t]he `double-counting' rule, adopted in some jurisdictions, has been applied to bar consideration of a divided asset for the purposes of calculating alimony." Rattee v. Rattee, 146 N.H. 44, 767 A.2d 415, 419 (2001). See also Cook v. Cook, 560 N.W.2d at 251 (Wis.1997).
Double-dipping disputes arise most often with assets whose value lies in their capacity to produce a future stream of cash income, such as pensions. However, even in the limited context of retirement funds where the rule is most frequently invoked, courts are sharply divided over its *350 propriety. Compare those cases applying the rule, Brown v. Brown, 574 So.2d 688, 691 (Miss.1990); Stemper v. Stemper, 403 N.W.2d 405, 408 (S.D.), mod. o.g., 415 N.W.2d 159 (S.D.1987); Diffenderfer v. Diffenderfer, 491 So.2d 265, 267 (Fla.1986); Kronforst v. Kronforst, 21 Wis. 2d 54, 123 N.W.2d 528, 534 (1963); In re Marriage of Colling, 139 Or.App. 16, 910 P.2d 1165 (1996), review denied, 324 Or. 78, 921 P.2d 967 (1996); Kruschel v. Kruschel, 419 N.W.2d 119, 122-23 (Minn.Ct.App.1988); and Walker v. Walker, 155 Mich.App. 405, 399 N.W.2d 541, 542 (1986), with those cases rejecting the rule, Sachs v. Sachs, 163 Vt. 498, 659 A.2d 678, 680 (1995); Krafick v. Krafick, 234 Conn. 783, 663 A.2d 365, 375, n. 26 (1995); Greer v. Greer, 807 P.2d 791, 794 (Okla.1991); In re Marriage of Klomps, 286 Ill.App.3d 710, 221 Ill.Dec. 883, 676 N.E.2d 686, 688 (1997); Moreno v. Moreno, 24 Va.App. 190, 480 S.E.2d 792, 799 (1997); Riley v. Riley, 82 Md.App. 400, 571 A.2d 1261, 1264 (1990); McFadden v. McFadden, 386 Pa.Super. 506, 563 A.2d 180, 184 (1989); In re Marriage of White, 192 Cal.App.3d 1022, 237 Cal.Rptr. 764, 768 (1987).[3]
New Jersey has not applied the double-counting rule to assets other than pensions, D'Oro v. D'Oro, 187 N.J.Super. 377, 454 A.2d 915 (Ch.Div.1982), aff'd, 193 N.J.Super. 385, 474 A.2d 1070 (App.Div. 1984), or assets (annuity payments) purchased with divided pension benefits. Innes v. Innes, 117 N.J. 496, 569 A.2d 770 (1990). But see Flach v. Flach, 256 N.J.Super. 333, 606 A.2d 1153 (Ch.Div. 1992). In the seminal case of D'Oro, supra, we upheld the lower court's ruling that the supporting spouse's pension could not be considered "income" for the purpose of determining alimony, holding that it would be unfair if the dependent spouse were able to assert what amounts to a double claim on the spouse employee's pension. We found its reasoning persuasive that "it would be inequitable for [her] to be able to include his pension income twice for her benefit, first for a share of equitable distribution, and second for inclusion in his cash flow determination of an alimony base." 187 N.J.Super. at 379, 454 A.2d 915.
The holding of D'Oro was subsequently codified by the Legislature in N.J.S.A. 2A:34-23(b) which, as amended, L. 1988, c. 153, provides:
When a share of a retirement benefit is treated as an asset for purposes of equitable distribution, the court shall not consider income generated thereafter by that share for purposes of determining alimony.
And in Innes, supra, our Supreme Court applied the amendment retroactively to annuity payments purchased with the proceeds of an equitable distribution pension award, rendering that asset ineligible as "income" for purposes of alimony modification. 117 N.J. at 504-13, 569 A.2d 770.
*351 In New Jersey, the bar against double counting of pensions is restricted to income from pension benefits that have been treated as an asset for equitable distribution purposes. Conversely, the rule does not bar counting as income for determining alimony that portion of the former spouse's pension attributable to post-divorce employment, and therefore not subject to division as marital property at time of divorce. Innes, supra, 117 N.J. at 504-06, 569 A.2d 770; Staver v. Staver, 217 N.J.Super. 541, 545, 526 A.2d 290 (Ch.Div. 1987). In other words, a supporting spouse's pension may be considered for purposes of alimony to the extent that post-divorce earnings enhance its value. By the same token, although assets purchased with the proceeds of a divisible pension award are not "income" for alimony purposes to the extent they reflect return of the principal, income generated by the principal is eligible for inclusion in the calculus used in revising an alimony award. Innes, supra, 117 N.J. at 513, 569 A.2d 770.
New Jersey is not alone in restricting the prohibition against double counting to pension benefits. Other courts have rejected the double-dipping complaint in contexts other than pensions. See, e.g., Clark v. Clark, 782 S.W.2d 56 (Ky.Ct.App.1990) (wife did not effectively receive a double award when the trial court used a capitalization of excess earnings method to value the goodwill of husband's medical practice and also granted wife a maintenance award based on husband's future earnings); Baumgartner v. Baumgartner, 95 Or.App. 723, 770 P.2d 965 (1989) (not inconsistent to award husband his dental practice and also use the dental practice as a source of income for purposes of computing support obligations, since husband's ability to pay these obligations would not be diminished by considering his practice a marital asset). Still other courts have rejected outright a double-dipping claim when raised to reduce or defeat child support, reasoning that as between parent and child, the pension or other asset subject to property division is not being counted twice. Cook, supra, 560 N.W.2d at 252; Klomps, supra, 221 Ill.Dec. at 907, 676 N.E.2d at 715. And as for those jurisdictions accepting the argument wholesale, at least one critic has noted that they have done so:
in conclusory fashion, without any elaboration of the issue or discussion of the parity question.... Once the property has been divided, a proper support determination requires that all the parties' income producing resources be taken into account. It is as immaterial that an income producing asset was awarded to one party in the property division as it is that an income producing asset was acquired before marriage or by inheritance or after divorce. That an asset qualifies, for any of those reasons, as a spouse's separate or individual property does not insulate it from the other spouse's support claims.
[Grace G. Blumberg, The Relationship Between Property Distribution and Spousal and Child Support, in 2 Valuation and Distribution of Marital Property, 41.07[3], at 41-69 to 41-71 (Gary N. Skoloff et al. eds., 1990).]
We discern no reason under the present circumstances to expand the prohibition against double counting beyond its statutory borders. The pension asset is sui generis in nature. Unlike the excess earnings involved here, a pension is a fixed passive asset, not actively worked as a business generating income. Under the usual pension benefits plan, a retiree has a right to a future stream of income attributable to past employment. The amount of the retiree's benefit is tied to the compensation the retiree received while employed, and *352 that portion of the gross amount earned during marriage and assigned a present value is equitably divisible. Distributed as marital property, our Legislature has deemed the asset outside the reach of the dependent spouse's need-based alimony claim.
Excess earnings, on the other hand, is a theoretical construct used to value the goodwill component of a closely-held corporation at a specific point in time, namely the date of the divorce complaint. It is a hypothetical figure unrelated to the actual value of the underlying asset on a going-forward basis and as a source of defendant's future income stream. In this case, when it valued Esco, the trial court adopted a capitalization of excess earnings method by which it attributed to the company defendant's salary in excess of what was determined would have been earned by a chief executive officer (CEO) of comparable experience and skill in the same field. To be sure, this attribution increased the company's value and consequently the value of plaintiff's distributive share therein. However, in doing so, the calculation involved defendant's past earnings, not future earnings. That is to say, the methodology requires an averaging of defendant's actual compensation over a period of years, a comparison of the actual average with the so-called theoretical CEO norm, and multiplying the excess by a capitalization factor.
Even in this respect, excess compensation is not, in itself, a discreet, divisible asset like a pension fund, with a value of its own. On the contrary, the capitalized value of defendant's future excess earnings represents only a portion of the value of the business. In other words, it is only one of several factors, along with, among others, real estate, equipment, inventory and accounts receivable, that comprise corporate value.
To reiterate, valuation of the corporate asset was based on defendant's past earnings, not his future earnings. Obviously, the effect of this approach was not to reduce the income actually paid to defendant in futuro. In fact, as evidenced by supplemental submissions, defendant's compensation in 2001 and his estimated compensation in 2002 far exceeded the average of his actual earnings over the four-year period used in the valuation methodology. As with the portion of a former spouse's pension attributable to post-divorce employment and therefore not subject to equitable distribution as marital property at the time of divorce, defendant's actual current and future compensation may be treated as income for alimony purposes.
We are satisfied that such treatment of current and future earnings results in no double recovery by plaintiff here primarily because the value of the divided asset was based on defendant's past, not future, earnings. Unlike the pension scenario where a specific stream of future income is converted into an asset that is then distributed, and therefore may no longer be calculated in the alimony formula, here the trial court did not really distribute the future stream of defendant's earnings, but rather the value of the business at a fixed point in time. Simply put, there is no double counting to the extent that alimony is based on spousal income which is not capitalized and then converted into, and distributed as, marital property. We therefore conclude that under the present circumstances, it was entirely proper to consider defendant's so-called "excess earnings" as a source of income for alimony.
To argue otherwise, as defendant urges, would be inconsistent with this State's strong legislative and judicial policy of providing support to the dependent *353 spouse in accord with the needs and earning capacity of the parties, and that alimony provides for support usually from current income. Bonanno, supra, 4 N.J. at 275, 72 A.2d 318. Defendant's argument also largely ignores the fact that unlike the retirement benefit, it was his actual, not theoretical, income plus corporate perquisites that funded the upper middle-class lifestyle enjoyed by the parties throughout their marriage, and it is the marital standard of living that is the primary consideration in determining the initial award of alimony. Crews, supra, 164 N.J. at 35, 751 A.2d 524. To allow plaintiff's distributive share of marital property to automatically defeat her needs-based claim would contravene the basic goal of alimony and result in the fundamental unfairness of having defendant alone partake in the benefit of future earnings in excess of "reasonable compensation."
We decline to adopt the "either-or" notion inherent in the so-called double-counting rule, certain that in appropriate instances, proper adjustments to equitable distribution on the one hand, or the alimony award on the other, or both, may be made to satisfy its underlying goal of fairness. Indeed, to the extent the rule is designed to avoid unfairness by carefully considering the division of assets and the probable effect of that division on the need for spousal support, it is not only theoretically sound, but squarely consistent with the statutory command to take into account an asset's role in equitable distribution in setting a proper amount of alimony. See N.J.S.A. 2A:34-23(b). In our view, the extent to which the asset may be looked to as a source of alimony should be influenced by the extent to which its value was distributed to the supported spouse as part of the equitable division of marital property.
Our quarrel is with the rule's absolute ban on dual consideration. Although in certain circumstances it would be unfair to look to a marital asset as a source for both alimony and equitable distribution, it is simply too categorical to conclude that because an asset is treated as a marital asset for purposes of equitable distribution, it can never be regarded as a partial source of alimony. Such an absolute bar on counting the asset in the property division and the alimony formula disregards the interrelationship between the two and impermissibly encroaches on the judicial function to consider all relevant circumstances. The Wisconsin Supreme Court's cautioning in Cook, supra, against application of the double-counting rule in a rigid way, bears repeating here:
Such an inflexible rule runs counter to the equitable nature of these determinations and to purposes underlying the broad legislative authorization that the circuit court consider relevant financial information in dividing the property and setting the level of maintenance.... Rather, the double [-]counting rule serves to warn parties, counsel and the courts to avoid unfairness by carefully considering the division of income-producing and non-income-producing assets and the probable effects of that division on the need for maintenance....

[560 N.W.2d at 252.]
Our review of the record on remand in this case convinces us that the trial judge properly considered all relevant factors, including defendant's actual income, in increasing the alimony award by $1,500 per month, thereby achieving, in our view, a fair result. To reiterate, consideration of defendant's actual income did not result in double recovery to plaintiff essentially because the valuation of the equitably distributed business asset was based on defendant's past, not future, earnings. But even assuming otherwise, there is no prohibition in this State against double counting *354 other than the statutory proscription with respect to pension benefits, an asset materially different than the "excess earnings" capitalized in this case. Under the circumstances, given the manner in which the marital lifestyle was historically funded, it was entirely appropriate to look to defendant's current as well as future stream of income to ensure continuation of that standard of living.
We also find no abuse of discretion in granting plaintiff counsel fees of $2,500 incurred in the defense of defendant's reconsideration motion. See R. 5:3-5(c); Williams v. Williams, 59 N.J. 229, 233, 281 A.2d 273 (1971); Fidelity Union Trust Co. v. Berenblum, 91 N.J.Super. 551, 561, 221 A.2d 758 (App.Div.1966).
Affirmed.
NOTES
[1] Arlein also made an adjustment by replacing Esco's ownership expenses related to its physical plant with a reasonable market rental rate, which he calculated at $60,640 per year.
[2] Among the factors to be considered in the award of alimony is "[t]he equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair[.]" Ibid.
[3] Even in those jurisdictions where courts adopted the prohibition against double dipping, there has been some retreat from application of an inflexible rule. Thus, other panels of Michigan's intermediate appellate court have distinguished Walker, supra, where the equities of the situation seemed to demand it. See Stoltman v. Stoltman, 170 Mich.App. 653, 429 N.W.2d 220 (1988); Lang v. Lang, 169 Mich.App. 429, 425 N.W.2d 800 (1988).

In Cook, supra, 560 N.W.2d at 252, the Wisconsin Supreme Court, reviewing its own decisions on the issue of double dipping, including the seminal decision in Kronforst, supra, 123 N.W.2d at 528, noted that because of the vast range of factual situations facing courts in dividing property and determining maintenance, some cases have found it inappropriate to enforce an absolute bar against counting a pension in the property division and in the maintenance decision, and cautioned against applying the double counting rule in an inflexible way.