**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5344-14T4

MICHAEL CATCHPOLE,

    Plaintiff-Respondent,

v.

HUI ZHANG,

    Defendant-Appellant.

_____

          Submitted December 14, 2016 — Decided August 9, 2017

          Before Judges Accurso and Manahan.

          On appeal from Superior Court of New Jersey,
          Chancery Division, Family Part, Essex
          County, Docket No. FM-07-1130-12.

          Shauger & Friedland, LLC, attorneys for
          appellant (Holly M. Friedland, on the
          brief).

          Michael K. Fielo, attorney for respondent.

PER CURIAM

    Defendant Hui Zhang appeals from several aspects of a June

18, 2015 judgment of divorce, which ended her five-and-a-half-

year marriage to plaintiff Michael Catchpole following a six-day

trial over custody, child support, equitable distribution and

alimony.   We affirm the judgment with one modification relating to a restriction the judge imposed on future applications by Zhang to relocate with the parties' only child to China.

We relate only the critical facts found by Judge Casale, all of which are amply supported by the record.   The parties were married in February 2006.   They have one child, a daughter, who was five years old at the time of the divorce.   Catchpole is a thirty-eight-year-old, college educated, applications manager at J.P. Morgan Chase.   Zhang is a forty-one-year-old civil engineer, employed by URS Corporation in Clifton.   She was born and raised in China, coming to the United States at age twenty-six for graduate school.   They met in 2004 and married in 2006. Six months prior to their marriage, Catchpole purchased a home for the couple in Upper Montclair, using $90,000 in savings and $10,000 borrowed from his parents for the down payment.

The marriage was punctuated by several domestic violence incidents, two of which are notable.   In 2009, several weeks after their daughter was born, Zhang slapped Catchpole several times in the face and bit him in the back of the neck while he was holding their daughter.   She was charged with aggravated assault.   After being pressured by Zhang and her family, Catchpole subsequently wrote to the prosecutor's office urging it to drop the charges.   That move, estranged Catchpole from his

own family, whom he did not see from that time until after he filed for divorce.

The other incident occurred the following year. Both parties testified that Zhang became angry at Catchpole in June 2010, after he offered to videotape something for their neighbors. Catchpole testified that Zhang cornered him in a room and yelled at him for almost two hours, until he lost his temper and punched her in the chest. Zhang went to the hospital the following day, claiming chest pains and difficulty breathing.

Although Zhang was not seriously injured, Catchpole testified he was alarmed by his inability to control his anger at her. He wrote a letter to Zhang telling her he was seeking professional help, but if it was unsuccessful he would leave, assuming all the expenses to allow her to continue living in their home and would give her all the money in their accounts, taking only his computer, laptop, tools and his car. That letter became the basis of the consent order, which was central to the dispute in this case.

The consent order was drafted by Zhang's attorney a year before the filing of the complaint. Catchpole was unrepresented. The order, which the judge found was revised four times before the parties finally signed it in December

2010, provided that in the event of divorce, Catchpole would continue to pay the mortgage, taxes and homeowners insurance until the mortgage was paid off or the house was sold. If the parties decided to sell, all proceeds would be paid to Zhang. The parties agreed to joint legal custody of their daughter, with Zhang as the parent of primary residence and Catchpole to have liberal parenting time. In addition to paying all tuition costs, Catchpole would also pay $3000 a month in child support. Both parties would retain their cars and Catchpole would get to keep his computer and all his tools.

The consent order further provided that Zhang would receive all the money in the parties' bank accounts, totaling approximately $70,000, regardless of how the account was titled. The order recited that the parties had freely entered into the agreement after considering all circumstances, and that they agreed to be bound by its terms. The judge found Catchpole signed the agreement only after reading an email from Zhang's attorney saying no court would ever enforce it.

Catchpole testified, and the judge found, that in addition to using the 2010 domestic violence incident against Catchpole to gain a financial advantage in the event of a divorce, Zhang also used it to threaten Catchpole about custody of their daughter. Specifically, the judge found Zhang repeatedly

threatened Catchpole, using the hospital records from the time he punched her, that she would return to China to escape his violence, taking their daughter with her.

The divorce action began with Zhang attempting to enforce the consent order pendente lite, and Catchpole opposing those efforts and attempting to maximize his time with the parties' daughter to inoculate himself against any attempt by Zhang to remove the child to China. In accordance with the consent order, the court required Catchpole to pay pendente lite child support of $3000 per month, as well as the mortgage, taxes and homeowners insurance of $2770, and to make a $35,000 cash payment to Zhang, representing one half of the obligation he undertook to give Zhang $70,000, representing all of the money in the parties' accounts, in the event of divorce.

Catchpole had argued, unsuccessfully, that Zhang had already removed $70,000 from the parties' accounts and was not entitled to an additional $35,000, even if the court determined to enforce the consent order, which he opposed on the grounds it was inequitable and entered under duress. In addition to ordering Catchpole to pay the sums required under the consent order, the judge also required him to pay all of Zhang's Schedule A and B expenses, another $1626 per month.

Accordingly, Catchpole's monthly pendente lite obligation totaled $7396.

When Zhang sought to enforce the financial terms of the consent order, Catchpole cross-moved for parenting time and to be designated the parent of primary residence. He claimed Zhang refused him time with the parties' daughter and failed to consult him on matters of her health and care. Catchpole argued the only way to insure a stable co-parenting relationship and prevent Zhang from taking the child out of New Jersey was to make him their daughter's primary custodial parent. The court denied his pendente lite request to be designated the parent of primary residence, but provided him regular parenting time and ordered that neither party should take the child out of New Jersey absent consent or court order. Three months after entry of that order, Zhang defied it by taking the child out of the country on a cruise to Bermuda without Catchpole's knowledge.

Because of their dispute over custody, the parties retained a joint custody evaluator, Mathias Hagovsky, Ph.D., to conduct a best interests evaluation. At trial, Dr. Hagovsky testified he found the toddler a happy and healthy three-year-old, who enjoyed a strong and positive bond with both her parents. Based on his observation and evaluation of the child and the parties, and interviews with them, the child's pediatrician, daycare

providers, and Catchpole's therapist, as well as notes of Zhang's physician, Dr. Hagovsky pronounced both parties fit parents.

The doctor testified that neither was perfect, Zhang was "a little intense," "somewhat . . . compulsive[,] . . . very concerned about many details about each situation," and Catchpole was "panicked[,] . . . very concerned that if he didn't get something very significant in terms of his time with the child, she was going to China."  Based on discussions with Catchpole's therapist, who conducted several sessions with both parties, and the doctor's own assessment, Dr. Hagovsky determined the 2010 domestic violence incident was an anomaly, and that Catchpole posed no threat to Zhang or their daughter.

Dr. Hagovsky testified that the child's best interests would be served by continuing Zhang as the parent of primary residence and increasing Catchpole's parenting time.  He rejected Zhang's desire for sole custody and Catchpole's wish to serve as the child's primary custodian as serving their own needs and not those of their daughter.  He acknowledged Catchpole's fear of Zhang removing the child to China, and accepted Zhang's representation that she had put the thought aside for the present.  Dr. Hagovsky testified the child would suffer psychological harm were she to be separated from

Catchpole by relocating with Zhang to China, given the child's age and strong attachment to her father.

Judge Casale found Dr. Hagovsky a well-qualified credible witness, candid and unbiased. After a detailed consideration of the testimony of the parties and the expert, considered within the framework of N.J.S.A. 9:2-4, the judge wrote that "[t]he decision as to who will be [the child's] primary residential parent is more difficult than at first blush." Although having no hesitation in finding Zhang "a good mother," the judge found several examples "of how [Zhang] does not keep [Catchpole] in the loop with regard to important decisions and violates her duties as a joint legal custodian." The judge found her testimony that she told Catchpole of her plans to take the child out of the country two weeks in advance, "not credible," and instead concluded she knowingly violated a court order she thought "ridiculous."

The court noted that since Dr. Hagovsky's evaluation, Zhang "continued to interfere with [Catchpole's] parenting time, removed [the child] from the United States on vacation in violation of a [c]ourt [o]rder, and has shown to be the less credible witness on the custody issues by far." Nevertheless, he agreed with Dr. Hagovsky's recommendation that consistency

was important and that Zhang continue as the child's primary residential parent.

The court expanded Catchpole's parenting time based on Catchpole's strong relationship with the child and Zhang's "continual interference with [his] parenting time in the past." Addressing the concern expressed by Catchpole and Hagovsky about Zhang's threat to remove the child to China, the court "restrain[ed] [Zhang] from making any relocation application for her to return to China with [the child] for at least five years" and restrained both parents from taking the child out of the country without consent or court approval. The court ordered the child's passport to be held by the Finance Division of the Superior Court.

Turning to the financial issues, the court first addressed the enforceability of the consent order. The court found that the agreement eventually embodied in the consent order was initially Catchpole's idea in an effort to save the parties' marriage. Although the court did not accept Catchpole's claim that he signed the agreement under the duress of Zhang's threats to take their daughter to China, it did find Catchpole signed it based, at least in part, on Zhang's lawyer's opinion that it was unenforceable. Relying on Segal v. Segal, 278 N.J. Super. 218, 222 (App. Div. 1994), that our courts will enforce marital

agreements that are fair, just and reasonable but will set aside those that are the product of overreaching, the court determined that it would enforce those provisions it found fair and equitable but would strike or modify those "terms which provided for non-modifications of [Catchpole's] obligations, and indefinite terms of [Catchpole's] obligations [which] are unfair, inequitable, [and] secured by advice from [Zhang's] counsel."

The court thus struck the obligation that Catchpole pay Zhang child support of $3000 per month, based on changed circumstances. When the agreement was signed, Catchpole was earning $172,000. He subsequently lost his job, however. At the time of the trial, Catchpole was earning a base salary of $135,000 per year, plus a $15,000 bonus, less than the $172,000 he was earning when he signed the agreement. The judge imputed another $10,000 to him, in light of some prior consulting work but declined Zhang's request that Catchpole's income also reflect his one-time $70,000 severance benefit and bonuses from his prior employer. The court found Zhang's income to be $70,000 per year.[1] Based on Catchpole's 104 overnights and

---

[1] Zhang contends this was error as her W-2 and tax returns showed she earned only $67,334.40. We find no error in the court "rounding up" the parties' incomes for purposes of calculating
(continued)

giving him credit for one-half of his $119.44 weekly health insurance premium attributable to the parties' child, the court calculated child support of $132 per week in accordance with the Guidelines.

The court also struck as inequitable that provision of the agreement making Catchpole responsible for all of their daughter's tuition costs. The judge rejected Zhang's expectations with regard to the funding of her daughter's education as "ludicrous," noting that "[s]he has already decided that [her daughter], a five-year-old child shall attend NYU, without regard to [Catchpole's] wishes or [the child's] wishes and abilities."

The judge determined there would be no requirement that the parties' daughter attend a private elementary or secondary school. Further, if the parties agreed to enroll the child in private school, they would pay tuition in accordance with the 55%/45% ratio of their incomes, as they would for extracurricular activities, childcare and unreimbursed medical expenses. The court encouraged the parties to contribute to a 529 plan, but declined to require them to do so. He determined

_____

(continued)
child support because the effect, if any, would be negligible, as Zhang herself concedes.

A-5344-14T4

the parties' contributions to their daughter's college expenses, "shall abide by the event, and shall be decided based upon existing case law and statutory law" at the time the child applies to college.

The court rejected Catchpole's claim that the marital residence was a pre-marital asset and instead found it was purchased in contemplation of marriage and subsequently titled in both their names, thus making it a marital asset subject to equitable distribution. The court, however, struck the term of the consent order obligating Catchpole to maintain the residence for Zhang and their daughter until the latter turned eighteen or the mortgage was paid off. Finding that Catchpole "has paid above and beyond his share of expenses for the marital residence," the court concluded that to obligate him "to all future payments on the mortgage until [their child] is [eighteen] is simply inequitable and unfair." The judge permitted Catchpole until September 1, 2015, to purchase Zhang's interest in the residence. In the event he declined to do so, the house was to be sold. The judge ordered Catchpole to continue paying the mortgage, taxes and homeowner's insurance through sale.

Applying the factors set forth in N.J.S.A. 2A:34-23.1, the court determined that the parties should share equally in the

12                                                      A-5344-14T4

equity of their marital residence, notwithstanding Zhang's minimal financial contribution, and likewise split evenly the value of the marital portion of their retirement accounts. The court determined to enforce that provision of the consent order requiring Catchpole to give Zhang the $70,000 in the parties' bank accounts. The court noted that unlike the provisions of the agreement it declined to enforce, the provision relating to the bank accounts was a finite obligation of definite duration.

The judge found, however, that Zhang removed $70,000 from the parties' accounts just after the parties separated and lied to the court about it. The court also rejected Zhang's claims that Catchpole had dissipated marital assets. Relying on the detailed proofs of the parties' finances submitted by Catchpole, the court found that Zhang had already taken what she was owed pursuant to the consent order by the time the court ordered Catchpole to pay her $35,000 pendente lite. Because Zhang had already wiped out their accounts, there was no money left to make that ordered payment, thus forcing Catchpole to borrow the funds from his 401k account to give to Zhang. The judge accordingly denied Zhang's request for a further payment of $35,000 and instead directed that Catchpole receive a $35,000 credit against Zhang's equitable distribution award.

Although the parties had been separated for three years at the time of the trial, the judge noted "they [were] still fighting as to the personalty." The judge rejected as not credible Zhang's claim that Catchpole took $11,000 in jewelry from the parties' home and rejected her claims for items of personal property pre-dating the marriage as well as for half the value of Catchpole's clothes. The court determined to allow Zhang to keep the furniture and other items remaining in the marital home and awarded Catchpole a $15,000 credit to equalize the disproportionate distribution to Zhang.

Applying the factors in N.J.S.A. 2A:34-23, the court determined Zhang was entitled to an award of alimony. Although the marriage was short term, lasting only five and one-half years, the court determined that limited duration alimony "of greater than 50% of the marriage" was appropriate because of the disparities in income. The court determined, based on the fourteen statutory factors, that four years of limited duration alimony of $2500 per month was reasonable, and indeed generous, based on the evidence presented.

Taking into account the $2770 per month Catchpole had been ordered to pay for the mortgage, taxes and insurance since November 2011, however, the court determined that not only had most of Catchpole's "alimony responsibility . . . already been

fulfilled" by the time of trial, he was owed a credit of $1000 per month for twenty-four months for his overpayment of Zhang's Schedule A and B expenses. Accordingly, the court ordered Catchpole to continue to pay the mortgage, taxes and insurance on the marital home until he either purchased Zhang's interest by September 1, 2015, or the house was sold. The court ordered Catchpole to thereafter pay Zhang $2500 a month in alimony from the date of sale or buyout until November 1, 2015.

Finally, the judge denied the parties' request for counsel fees. He found Catchpole's income was sufficient to permit him to pay his own counsel fees, and that Zhang obtained "significant cash" from the parties' bank accounts on their separation and received $3000 a month in child support, a figure "well above the child support guidelines" during the over three years the divorce was pending. The judge further found Zhang "acted in bad faith" with regard to her financial demands, and that both parties "acted unreasonably" resulting in many pre-trial motions and "excessive litigation," precluding an award of fees to either.

Zhang appeals, contending the trial judge erred in prohibiting her from filing an application to relocate to China with the parties' child for five years, in failing to enforce the parties' consent order, in calculating the parties' incomes

for purposes of support, in awarding Catchpole a credit of $15,000 for the contents of the marital residence, in considering the payment of pendente lite support in setting alimony and for awarding Catchpole credits for overpayment of pendente lite support. She also contends she was denied due process and the opportunity to present evidence with regard to support credits and the removal of $70,000 from her personal account, and that the trial judge was biased against her. With the exception of the restriction imposed on her access to the courts, which Catchpole agrees should be lifted, we reject her arguments.

Judge Casale was the judge responsible for this case from its filing in November 2011 through entry of the judgment of divorce in 2015. He was extremely familiar with the matter having decided the pendente lite motions and presided over the six-day trial. When a Family Part judge has made findings of fact after considering the testimony and documents the parties have presented during a non-jury trial, the judge's findings are "binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'r Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

In addition to the respect we owe to "the family courts' special jurisdiction and expertise in family matters," deference is especially appropriate when the case turns, as this one did, on questions of credibility. Id. at 412-13. "Because a trial court 'hears the case, sees and observes the witnesses, [and] hears them testify,' it has a better perspective than a reviewing court in evaluating the veracity of witnesses." Id. at 412 (quoting Pascale v. Pascale, 113 N.J. 20, 33 (1988) (internal quotation marks omitted)). Accordingly, we will not reverse a trial judge's findings of fact unless they are "'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Clark v. Clark, 429 N.J. Super. 61, 70 (App. Div. 2012) (quoting Rova Farms, supra, 65 N.J. at 484).

Zhang's central argument on appeal is that the trial court's decision "is manifestly unsupported by and inconsistent with the evidence presented." Having reviewed the record, we disagree. The judge's calculation of the parties' incomes, the credit awarded Catchpole for the contents of the marital residence, his consideration of the payment of pendente lite support in setting alimony and the credits awarded Catchpole for overpayment of pendente lite support, are all well anchored in the record.

A-5344-14T4

The court's decision to base Catchpole's income on what he was being paid in his new job, instead of averaging the bonus income no longer available to him from his prior position, was reasonable and in accord with the Guidelines, as was the decision to exclude his one-time severance payment as non-recurring, sporadic income. See Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-B to R. 5:6A at www.gannlaw.com (2017). The court's calculation of the $60 credit to Catchpole for the cost of health insurance for the parties' daughter was likewise in accord with the Guidelines, which direct that in the absence of proof of the actual cost of adding the child to the policy, the parent's total premium should be divided by the number of persons covered by the policy. See ibid. As Catchpole pays $119.44 per week for health insurance, and has only one child, the $60 credit was calculated in accord with the Guidelines.[2]

Although the $15,000 credit to Catchpole for the contents of the marital home is not subject to such a precise calculation, its basis is nevertheless easily discerned. The court reviewed the three personal property lists the parties

---

[2] Although Zhang argues in her reply brief that the premium should have been divided by three, she does not explain the basis of that belief, and does not support it with a citation to the record.

submitted, including Zhang's list of the items remaining in the residence, which she estimated as having a value of $32,270. Because the court determined that Zhang would retain the entirety of the contents, a $15,000 credit to Catchpole is reasonable and supported by the record. The court did not believe Zhang's claim that Catchpole removed $11,000 in jewelry from their home, and the items he took, largely consisting of his car, computer and tools, were permitted by the consent order.

We find no error in the court having considered that Catchpole had already paid pendente lite support for three and a half years in setting alimony in this five-and-a-half-year marriage. Zhang does not dispute that the 2014 amendments to the alimony statute, L. 2014, c. 42, § 1, apply here. The 2014 amendments added a new factor for courts to consider in fashioning an alimony award, "[t]he nature, amount, and length of pendente lite support paid." N.J.S.A. 2A:34-23b(13).

In considering Zhang's needs and all fourteen enumerated factors of the alimony statute, the court determined that continuing support payments through November 1, 2015 would result in Catchpole having paid Zhang four years of support in a five-and-a-half-year marriage. The court rejected Zhang's

A-5344-14T4

request for an additional six years of alimony, terming it "unwarranted and inequitable."

The award of alimony is "broadly discretionary." <u>Steneken v. Steneken</u>, 367 <u>N.J. Super.</u> 427, 434 (App. Div. 2004), <u>aff'd as modified</u>, 183 <u>N.J.</u> 290 (2005); <u>see also</u> <u>N.J.S.A.</u> 2A:34-23. We will reverse a trial judge's decision concerning alimony only if "the findings were mistaken or . . . the determination could not reasonably have been reached on sufficient credible evidence present in the record after considering all of the proofs as a whole." <u>Gonzalez-Posse v. Ricciardulli</u>, 410 <u>N.J. Super.</u> 340, 354 (App. Div. 2009).

Measured by those standards, we cannot find the trial judge abused his discretion in establishing this limited duration award. Indeed, we note that were Zhang's argument accepted, that the four-year award should have commenced with the entry of the judgment, she would receive seven and a half years of alimony in a five-and-a-half-year marriage, contrary to the mandate of <u>N.J.S.A.</u> 2A:34-23c ("For any marriage or civil union less than 20 years in duration, the total duration of alimony shall not, except in exceptional circumstances, exceed the length of the marriage or civil union.").

We likewise find no abuse of discretion in the judge's award of credit to Catchpole for overpayment of pendente lite

support.  It is well established that pendente lite support orders, which are almost always entered without a plenary hearing, are subject to modification at trial.  Mallamo v. Mallamo, 280 N.J. Super. 8, 12 (App. Div. 1995); Jacobitti v. Jacobitti, 263 N.J. Super. 608, 618 (App. Div. 1993), aff'd, 135 N.J. 571 (1994).

As previously noted, Catchpole was ordered to pay the mortgage, taxes and insurance for the residence during the pendency of the divorce in accordance with the parties' consent order, a monthly sum of $2770.  He was also ordered to pay all of Zhang's remaining Schedule A and B expenses, another $1626 per month according to Zhang's case information statement.  The judge calculated that Catchpole paid "$1,000 per month more for a two-year period than he was obligated to pay under the [c]onsent [o]rder," in the form of "repairs, maintenance, electric and gas, water and sewer, cable-TV, and various other miscellaneous expenses."  He thus awarded Catchpole a $24,000 credit against equitable distribution.

Ignoring the amounts listed in her own case information statement, Zhang argues that Catchpole only testified that he had been paying these expenses in his rebuttal case, and that he "presented no documentation to support his claim."  The record, however, is replete with proof of these payments.  Catchpole

certified to the court in June 2013 that he had been paying the "electric, gas, water, sewer and cable." Zhang likewise confirmed Catchpole's payments in her own certifications filed with the court in August and September 2013. Specifically, Zhang acknowledged that Catchpole had abided by the court's order from February 2012 "by paying all of the Schedule A and B expenses," and objected to having to assume paying "for the utilities, which are approximately $800 per month." Indeed, Zhang contended that Catchpole "has paid for the utilities to the home for more than [two] years and he must continue to do so as it is the status quo."

Thus, in addition to the amounts in Zhang's own case information statement relied on by the court, the record reflects that Catchpole paid $270 more than the $2500 allotted for alimony by paying the $2770 monthly expense for the mortgage, taxes and insurance and another $800 in utilities. We thus reject Zhang's assertion that the $24,000 credit is without support in the record or was otherwise an abuse of discretion. See Steneken, supra, 367 N.J. Super. at 434.

We also find no error in Judge Casale's decision to enforce those provisions of the parties' pre-divorce consent order he found fair and equitable and to strike or modify those he found the product of overreach. "Settlement agreements in matrimonial

22

matters, being 'essentially consensual and voluntary in character, . . . [are] entitled to considerable weight with respect to their validity and enforceability' in equity, provided they are fair and just."  Dolce v. Dolce, 383 N.J. Super. 11, 20 (App. Div. 2006) (alteration and omission in original) (quoting Petersen v. Petersen, 85 N.J. 638, 642 (1981)).  The law, however, "grants particular leniency to agreements made in the domestic arena, and likewise allows judges greater discretion when interpreting such agreements.  Such discretion lies in the principle that although marital agreements are contractual in nature, 'contract principles have little place in the law of domestic relations.'"  Guglielmo v. Guglielmo, 253 N.J. Super. 531, 542 (App. Div. 1992) (citation omitted) (quoting Lepis v. Lepis, 83 N.J. 139, 148 (1980)).  Our Supreme Court has recently reaffirmed the Family Part's power to reform a settlement agreement due to "'unconscionability, fraud, or overreaching in the negotiations of the settlement.'"  See Quinn v. Quinn, 225 N.J. 34, 47 (2016) (quoting Miller v. Miller, 160 N.J. 408, 419 (1999)).

As we have noted, Judge Casale was extremely familiar with this matter, having handled it since its inception.  As is obvious from his detailed opinion, he immersed himself in the proofs and considered all of the evidence adduced by the

parties. He also made express credibility findings. He found Catchpole "a credible witness, who was honest and forthright in his testimony. He answered questions in a straightforward manner, and when he could not recall a detail would simply testify that he could not recall, and not lie or exaggerate as to that particular issue." Zhang, in contrast, the judge found "not a credible witness."

Although finding that the agreement that eventually became the consent order was initially Catchpole's effort to salvage his marriage, the judge was also convinced that Zhang's repeated threats to return to China with the parties' daughter loomed large over Catchpole. Thus while enforcing the provision providing Zhang with $70,000, consisting of all the money in the parties' accounts, he declined to enforce those provisions imposing lifetime commitments for support. Having reviewed the record and considered the parties' arguments, we find no error in the judge's treatment of the consent order.

Zhang's arguments that the court erred in finding that she received the $70,000 provided in the consent order at the time of the separation and that she was denied due process and the opportunity to present evidence on the issue are without merit. Catchpole maintained from the first pendente lite motion in the case that Zhang had removed $70,000 from the parties' accounts

when he left the marital home.  He testified on direct with reference to Zhang's own bank statements that she withdrew exactly $70,000 from her personal savings account several days after he moved out.  Zhang maintained from the first pendente lite motion forward that the money in her account came from her parents and other sources and was not funds of the marriage.  She did not provide proof of her assertions on the motion and likewise presented no evidence on the point at trial.  The record supports the judge's conclusion that Zhang took the monies she was entitled to under the consent order at the time the parties separated and thus was not entitled to the $35,000 payment she received pendente lite, and that she had ample opportunity to contest the issue at trial.

Zhang's remaining arguments, including that the trial judge harbored a bias against her, are without sufficient merit to warrant discussion in a written opinion.  See R. 2:11-3(e)(1)(E).  That the judge found Zhang an unreliable witness who repeatedly offered testimony the judge determined was not credible does not equate to bias.  See Strahan v. Strahan, 402 N.J. Super. 298, 318 (App. Div. 2008) ("Bias cannot be inferred from adverse rulings against a party.").

Because Catchpole does not oppose Zhang's demand that the restriction the judge imposed on future applications by Zhang to

relocate with the parties' child to China be reversed, we have no need to consider whether the restriction violated Zhang's constitutional right to access to the courts. <u>See</u> <u>Brown v. Grabowski</u>, 922 <u>F.</u>2d 1097, 1113 (3d Cir. 1990). We thus order a limited remand for the purpose of excising that provision from the judgment. We do not disturb the provision requiring the court's custody of the child's passport. We agree with Zhang that Catchpole's concession on this point does not entitle him to any affirmative relief.

Affirmed as modified, and remanded for entry of a conforming judgment. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5344-14T4