**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0830-16T1

B.G.,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

E.G.,

    Defendant-Appellant/
    Cross-Respondent.

_____

Submitted March 21, 2018 — Decided August 31, 2018

Before Judges Fuentes, Koblitz and Suter.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Union County,
Docket No. FM-20-1592-14.

Weinberger Law Group, LLC, attorneys for
appellant/cross-respondent (Jessica Ragno
Sprague, on the brief).

Steven H. Wolff, attorney for respondent/cross-
appellant.

PER CURIAM

    Defendant E.G. appeals from the custody, alimony, child

support, equitable distribution, and life insurance portions of

the September 21, 2016 Final Judgment of Divorce (FJOD).[1] Plaintiff B.G. cross-appeals the equitable distribution and attorney fee provisions of the FJOD.

We reverse the child support calculation set forth in the September 21, 2016 child support order, which contained a clerical error, and order a correction to conform that order to the FJOD. We reverse the court's denial of a credit to defendant against his pendente lite support arrears from August 2014 to October 2014 of $8700, reducing the arrears for that period by $4,429.68 for a total of $4,270.32.[2] We vacate the FJOD's requirement that the parties live within fifteen miles of each other. We reverse the inclusion in equitable distribution of any property that defendant acquired from Ophthotech after April 1, 2014, the date after the divorce complaint was filed, and the court's order that plaintiff's credit card debt be paid jointly from marital assets. We also remand to the trial court to enter an order clarifying which party pays for maintenance and expenses of the marital home. We affirm all the remaining issues.

---

[1] We use initials in the caption for the litigants and fictitious names for the children to maintain their privacy. R. 1:38-3(d)(13)

[2] This is not intended to affect any other arrears that occurred after October 2014.

I.

A.

The parties were married in May 2000, although they started dating in 1988, and resided together sometime between 1992 and 1994. They have four children: Mary, born in 1994; Edward, born in 2000; Quincy, born in 2003; and Jane, born in 2008. Mary was emancipated by the time the court entered the FJOD.

At the time of the divorce trial, plaintiff was forty-six and a full time homemaker. Defendant was forty-eight, then unemployed, having most recently been employed as the director of drug product manufacturing for a drug company where he earned an annual salary of $175,000. Since December 2015 through the trial, he was collecting $636 per week in unemployment benefits. Both parties are college educated. Plaintiff's degree is in computer technology. She worked for seven years before the marriage. She has not been employed since 1999. Her highest income was $44,318 in 1999.

Quincy suffers from autism and pervasive developmental delays, and requires constant supervision because of his impulse control and anger and frustration problems. He attends a specialized school, the expense of which is provided through the school district until he is twenty-one. It is expected he will require continued care in the future.

A-0830-16T1

Plaintiff filed for divorce on April 1, 2014. Following a twenty-three day trial, the trial court entered a FJOD on September 21, 2016, accompanied by an eighty-three page written letter opinion. Defendant appealed the FJOD, and plaintiff filed a cross-appeal.

## B.

No one disputed the trial court's finding that the parties suffered "irreconcilable differences for more than six months prior to the trial" and were entitled to a divorce. The FJOD awarded joint legal custody of the three minor children to plaintiff and defendant. It designated plaintiff as parent of primary residence (PPR) of Quincy and Jane. Defendant was designated the PPR of Edward and granted parenting time with Quincy and Jane. Plaintiff did not immediately have parenting time with Edward, but the FJOD ordered reunification therapy in its stead. The parties do not appeal the parenting time schedule or the order for reunification therapy.

In ordering custody, the court found the testimony of the court-appointed expert, Dr. William Campagna, to be "credible and sensible" and gave it considerable weight. He testified the family was "very dysfunctional" and there was "considerable disagreement" between the parties.

The court interviewed the children with the exception of Quincy. Mary and Edward wanted to live with their father, citing a number of incidents not favorable to their mother, including that she was verbally demeaning and critical, a food hoarder, and treated the children inconsistently by favoring the younger children. Edward said that one time plaintiff slapped him and made him sleep on a mattress on the floor. The court recounted that Jane "spoke lovingly of her mom in a sincere and heartfelt credible way."

Dr. Campagna recommended plaintiff as the PPR for Quincy, who was doing well in the special school he was attending. He also recommended that Quincy remain in the marital home, if financially possible, so that he would only have minimal changes. The court considered testimony from Quincy's school psychologist, nurse at Children's Specialized Hospital, and a school social worker, all of whom testified they had more interaction with plaintiff than defendant regarding Quincy.

The court found it was in the best interests of the children for plaintiff to be the PPR for Quincy and Jane, and defendant the PPR for Edward. The court analyzed the factors under N.J.S.A. 9:2-4, and found the parties "have no ability to agree, communicate, or cooperate in matters relating to the children." Although both wanted custody of the three unemancipated children,

Edward's relationship with his mother was strained, according to Dr. Campagna. The judge was able to confirm Dr. Campagna's psychological assessment of Edward's relationship with his mother when the judge interviewed the children. Edward did not want to "speak to or engage in therapy with his mother at this time." Plaintiff had accepted Dr. Campagna's custody plan that Edward reside with his father. Jane had a good relationship with her mother and, depending on plaintiff's job, plaintiff may have more parental availability for her. The parties did not have a history of domestic violence.

The court indicated that the testimony by Mary and Edward about their mother was "of serious concern" to the court, and that all the children had been "hurt and harmed by the dysfunction of their parents' divorce," but it did not find they had "suffered any physical abuse by either party." The court found that the children "appear to be safe with both parents."

The court agreed with the custody recommendations of Dr. Campagna that Edward reside with defendant, and Jane and Quincy reside with plaintiff. She has been the primary caretaker for Quincy, and Jane has a close relationship with her. It ordered co-parenting counseling and reunification therapy for a more stable environment for the children. Quincy was stable in his current school as were the other children. The court found that

A-0830-16T1

this custody arrangement "advances all the children's educational needs." Neither parent was found to be unfit, but their animosity toward each other was "not benefiting any of the children."

The court considered the geographic proximity of the parents, who at the time were residing together in the marital home. Plaintiff wanted to continue to reside there and to be near Quincy's school. Dr. Campagna opined that the parents needed to live within a thirty-minute drive from each other. He noted that the children would be attending three different schools. Based on Dr. Campagna's testimony and the fact that the children had daily exposure to both parents at the time of the trial, the court ordered that the parties were "not to move more than [fifteen] miles from each other going forward in order to further parenting time between each parent and all of the children." The court considered that each parent was spending "extensive time with all of the children."

The court considered the factors under N.J.S.A. 2A:34-23.1 in making equitable distribution of the parties' marital property. It placed the burden of establishing that property acquired during the marriage was immune from equitable distribution on the party that asserted the immunity.

The parties had a fourteen-year marriage, but the court noted they had been a monogamous couple for nearly twenty years. They

were in good health with "no documented proof of emotional instability." Neither had brought property into the marriage. They had no pre-nuptial agreement.

The court found they had a "squarely middle class" standard of living. The parties relied primarily on defendant's income throughout the marriage which averaged $132,642 from 2010-2014. Defendant also had a limited liability company (LLC) through which he purchased investment properties. They took vacations, although not "extravagant ones," and did not shop at "fine stores." At the time of trial, defendant had lost his job and was collecting unemployment. He claimed to have borrowed money from his mother and a friend to pay for household expenses. The court considered their case information statements showing that "their lifestyle spending exceeded what it should have" based on the parties' annual income in concluding "neither party will be able to maintain the marital lifestyle going forward."

They had four investment properties in Pennsylvania and one in Buffalo, New York. These were used for rental income; only one had a mortgage. The court found the ownership of the properties allowed the parties "to deduct a portion of the parties' household expenses and vehicles from their income taxes." Although they did not dispute the values of the properties or that the properties

A-0830-16T1

were capable of producing income, the court ordered an appraisal of the properties.

One of the properties, purchased in 2002, was rented to defendant's mother for $775 per month. Defendant claimed that in 2013, the LLC transferred title to his mother and that she no longer pays rent. He did not recall telling plaintiff about the transfer, nor was there a deed to evidence it.

The court appointed Dr. Charles Kincaid, a vocational rehabilitation specialist, to evaluate plaintiff's future employability because she had not been in the workforce for fourteen years. He opined she could return to work with training. He identified three job areas, which included computer programing, teaching, and employment as an administrative assistant.

The court found plaintiff credible that it would be difficult for her to return to the job market given the number of years she had not worked, the need for retraining, and her child care responsibilities, especially for Quincy. It discounted as not entirely credible or reliable, Dr. Kincaid's analysis because he did not take into consideration plaintiff's child care issues or commute. The court found most credible his opinion that plaintiff was employable as an administrative assistant, earning approximately $39,000 per year, which was the amount of income that the court imputed to plaintiff.

A-0830-16T1

The court found defendant had the "greater earning capacity" based on his employment history. During the five years before the divorce complaint was filed, including 2014, their joint tax returns showed an average income of $132,642. After the complaint was filed, he worked with a firm (Ophthotech) where he earned $175,000, as well as vested and unvested stock, bonuses and a severance package. However, that company had given him three options: to continue with it on a "performance plan," accept less income and transfer to Colorado, or separate from the company with a severance package. He chose the latter. The court found he was employable in the pharmaceutical or real estate fields, that his unemployment was voluntary and imputed an annual income to him of $132,642.

The court considered that plaintiff had worked before they were married and afterwards contributed to defendant's "high earning power" by "caring for the household and the four children."

Defendant was laid off from Merck just days before plaintiff filed for divorce. His $50,000 severance package was received shortly after the complaint was filed. Defendant testified that he used those funds to pay a Pennsylvania attorney for work in connection with the investment properties, but he did not provide written evidence to substantiate that testimony. As such, the

court found that the Merck severance was subject to equitable distribution, and awarded $25,000 to plaintiff.

The court found that it would be "detrimental" and not in the best interest of Jane or Quincy to be removed from their current schools, concluding that plaintiff had a need to continue to occupy the marital home until Jane graduated high school. After that, the court ordered the marital residence to be sold and the proceeds divided evenly between the parties.

The court considered the parties' debt. There was only one mortgage of $62,954 on the rental properties, although the marital property was mortgaged for $396,500. Defendant had a number of loans. He claimed his mother loaned him a total of $73,450 beginning in August 2011. Defendant's mother testified about an itemized listing of these loan amounts, but the list was not notarized or witnessed. She testified their agreement was made in "private." At the time of trial, none of these loans had been paid back.

Defendant testified that a friend of his, Jerry Stern, loaned him $30,000 that he used to pay a litigation fund, which had been ordered by the court to pay marital debt and his pendente lite support obligation to plaintiff. He also claimed to have a loan from Wells Fargo Bank.

11

The court ordered that defendant was solely responsible to repay these loans because there was no proof of the purpose of the loans, he had not discussed them with plaintiff and the loan documents related to the Jerry Stern loan were "self-authored and self-serving."

Both parties had credit card debt. Plaintiff testified she had to take out a credit card during the divorce to cover Schedule C expenses because defendant failed to pay his $2900 per month pendente lite support. The court ordered that all of the parties' credit card debt was to be paid from the proceeds following sale of their investment properties.

Pursuant to a June 27, 2014 court order, defendant was required to pay $2900 in pendente lite support to plaintiff for Schedule C expenses, including food, medical insurance, clothing, activities, and debt services for the family. In October 2014, the court ordered defendant to pay $100 per week through wage garnishment for pendente lite support arrears of $8700.[3] At trial, defendant contended he was not in arrears, having made payments between July 2014 and October 2014 for Schedule C items. He proffered supporting bank records and credit card statements. He claimed that plaintiff was accumulating the pendente lite payments

_____

[3] The parties have not included this order in the record.

to use for attorney's fees. She acknowledged she was thinking about this but had not done so. The court denied defendant's request for a credit, finding that the payments presented at trial did not show that he was not $8700 in arrears.

The court found that the parties' real estate was acquired during the marriage and was subject to equitable distribution. The court did not find credible the testimony that one of the investment properties had been gifted to defendant's mother. The court found defendant did not meet his burden of showing that property was immune from distribution and found instead that "the transfer was a dissipation of a marital asset." The court ordered that property also was to be sold and the proceeds divided evenly between the parties. The court further ordered that all the properties, save for the marital home, were to be sold and appointed an agent to market and sell the properties. The monies were to be held in escrow pending payment of marital debt. The court ordered that the marital home was not to be sold until Jane graduated high school, and then, the proceeds were to be divided fifty-fifty. The court's order divided the motor vehicles and bank accounts.

Defendant also had three retirement accounts. One account was pre-marital and not subject to equitable distribution. The court ordered the even distribution of the other two; one from

13                                                          A-0830-16T1

Merck and one from Ophthotech, subject to qualified domestic relations orders, with a credit to plaintiff for any invasion of these funds for litigation.

Plaintiff requested open durational alimony, but defendant only wanted to pay rehabilitative alimony. In evaluating the need for alimony, the court considered the factors in N.J.S.A. 2A:34-23(b) and (c). The court noted the parties had been a couple living together as husband and wife since "1992 or 1994," "dependent on one another financially." Plaintiff contributed to defendant's career by caring for the household and the four children; she did not maintain her career readiness. The caretaking responsibilities for the children were primarily plaintiff's, particularly for Quincy. Plaintiff was imputed income, but realistically her available jobs are "limited by her caretaking responsibilities." Defendant also would have caretaking responsibilities, but they were not as demanding as plaintiff's. The court considered that the parties needed separate residences and that they had a middle class lifestyle but that neither could maintain that lifestyle going forward.

Defendant was ordered to pay $3500 per month in open durational alimony because the court found exceptional

circumstances to adjust the duration of the alimony.[4] With respect to the duration, the court considered that the parties lived together "in an economically exclusive supportive relationship since 1992," which the court considered as equivalent to a long-term marriage of over twenty years. The court also considered Quincy's severe autism and plaintiff's primary role in caring for him. With respect to the amount of alimony, the court considered plaintiff's need for alimony and defendant's ability to pay it based on their work histories, standard of living, ages, health, earning capacities, investment properties, and parental responsibilities. The court also considered the time and expense for plaintiff to be retrained before going into the workforce, the equitable distribution of property, income available to the parties, tax treatment of any alimony award, the amount of pendente lite support, the parties' case information statements, and testimony about expenses. Given all of this, the court considered that defendant could pay $3816 per month in alimony but reduced it to $3500 per month in open durational alimony in light of his custody of Edward.

---

[4] There was a subsequent ability to pay hearing, resulting in an order dated April 10, 2018, that reduced the amount of alimony to $2420 per month with child support of $232 per month, for a total to be paid by defendant of $2652 per month.

The court applied the Child Support Guidelines in determining the amount of child support. The court found that defendant's child support obligation for Quincy and Jane was $190 per week and plaintiff's child support obligation for Edward was $221 per week, for a net obligation by plaintiff to defendant of $31 per week. The child support order mistakenly said the opposite- that defendant owed child support to plaintiff of $31 per week.

The court ordered the parties to share equally the costs of "summer camp, school uniforms, children's lessons and sports, and other extracurricular activities." The court noted the equal division reflected their imputed incomes after alimony. The court also addressed college expenses following its review of the factors set forth in <u>Newburgh v. Arrigo</u>, 88 N.J. 529, 545 (1982).[5]

Defendant requested an adjustment of his alimony obligation to reflect the $2900 per month pendente lite support payments he made up to February 2016, when he became unemployed. The court denied this, finding the two awards, alimony and pendente lite support, were similar in amount, that plaintiff had no ability pre-divorce to pay expenses without income, and no credit was appropriate because defendant was voluntarily unemployed.

---

[5] We have not detailed this part of the FJOD because neither party raises issues about it in the appeal.

The court ordered defendant to maintain $350,000 in life insurance to secure his alimony obligation with plaintiff as beneficiary and $250,000 in life insurance with the minor children as beneficiaries, including Quincy. There was no similar obligation for plaintiff.[6]

The court denied both parties' requests for attorney's fees. The court analyzed the factors under RPC 1.5(a) and Rule 5:3-5(c), finding that neither party acted more reasonably than the other, both parties unnecessarily increased the amount of outstanding attorney's fees, and both parties were successful on some counts and unsuccessful on others.

### C.

On appeal, defendant contends the trial court erred by not giving more weight to the testimony of the children when considering the custody of the two younger ones. He argues the trial court should not have restricted the residential location of the parties by ordering them to reside within fifteen miles of each other. Defendant urges us to reverse the alimony award because the court erred in considering the time period before they were married in granting open durational alimony for a period of

---

[6] The parties did not take issue with the court's order regarding alternating tax exemptions for the children, or defendant's obligation to provide health insurance for the children.

time longer than they were married, and erred by trying to equalize their incomes and by not addressing their needs and ability to pay. Defendant asserts the child support order contains an error. It orders defendant to pay child support to plaintiff when the FJOD orders plaintiff to pay child support to defendant. Defendant also challenges the court's separate treatment of certain extracurricular expenses, requiring the parties to share these equally when they are included in the child support amount. Defendant disputes the awarded equitable distribution, arguing that the marital residence should be sold now and not when the youngest child graduates high school. He claims the court erred by ordering the sale of the house he transferred to his mother, by including certain post-complaint assets in the distribution, by including plaintiff's credit card debt, and by not granting him certain credits.

Plaintiff's cross-appeal claims their property should not have been divided on a fifty-fifty basis and that the court erred by not awarding her request for attorney's fees.

II.

"[W]e accord great deference to discretionary decisions of Family Part judges," Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012), in recognition of the "family courts' special jurisdiction and expertise in family matters." N.J. Div. of Youth

& Family Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)). We are bound by the trial court's factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Hitesman v. Bridgeway, Inc., 218 N.J. 8, 26 (2014) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

A.

Defendant contends the trial court erred by failing to give sufficient weight to the "probative testimony" of Mary and Edward in determining custody of Jane and Quincy. We discern no abuse of discretion.

In a custody determination, the best interest of the child is fundamental. D.A. v. R.C., 438 N.J. Super. 431, 450 (App. Div. 2014). The court is to apply the factors set forth in N.J.S.A. 9:2-4 in its evaluation. Ibid. Included in these factors, is "the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision." Id. at 456. Although "[t]he child has a right to be heard and voice an opinion

to the finder of fact and ultimate decision-maker[,] [t]he court need not be bound by the child's view." Mackowski v. Mackowski, 317 N.J. Super. 8, 12 (App. Div. 1998). We review a custody award under an abuse of discretion standard, giving deference to the court's decision provided that it is supported by "adequate, substantial, and credible evidence in the record." Cesare, 154 N.J. at 412.

Here, a review of the thorough opinion of the trial court shows that it took into consideration all of the statutory factors and interviewed each of the children except Quincy. The court specifically discussed Edward and Mary's negative in-chambers testimony about their mother. The trial court noted its suspicion, however, that the children were rehearsed and coached because of the consistency of their testimony. Nonetheless, the court did not "discount their sincere testimony and preferences." The court evaluated the testimony of the court appointed expert, who was found to be credible and sensible and who recommended the custodial arrangement that the court ordered. Our review shows there is substantial credible evidence in the record to support the trial court's order regarding custody, that the court gave adequate and appropriate weight to the testimony of Edward and Mary, and did not abuse its discretion in entering the custody order.

A-0830-16T1

B.

Defendant contends the court erred by restricting them from moving more than fifteen miles away from each other. He asserts this violated his constitutional rights. Although we do not agree that the provision infringed a constitutionally protected right to travel, we do agree that it was not supported by substantial credible evidence in the record and remand for vacation of that provision.

The court ordered the parties "shall not move more than [fifteen] miles away from each other in order to further parenting time between each parent and all of the children." Dr. Campagna testified it would be "optimal if the children did not change their friends, their locations, their habits." With respect to the distance between residences, it was his opinion, although "completely subjective," that "[i]f it's more than a half hour . . . it becomes problematic." In ordering the fifteen mile limitation, the court considered this testimony, the children's testimony, the fact that the children had daily exposure to both parents, and that the parents spent extensive time with them.

Recently, the Court has clarified that the best interest standard applies in reviewing an application under N.J.S.A. 9:2-2 by a custodial parent to remove a minor child to a jurisdiction outside of New Jersey. Bisbing v. Bisbing, 230 N.J. 309, 322

21                                          A-0830-16T1

(2017). Relocation within the State is not subject to N.J.S.A. 9:2-2. Schulze v. Morris, 361 N.J. Super. 419, 426 (2003). However, "the relocation of a child by the residential custodial parent from one location in New Jersey to another may have a significant impact upon the relationship between the child and the non-residential custodial parent that may constitute a substantial change of circumstances warranting modification of the custodial and parenting-time arrangement." Ibid.

Here, the fifteen-mile limitation in the FJOD was addressed to advance the children's interests in maintaining contact with both parents once the divorce was final. However, the limitation was not supported by substantial credible evidence in the record. Dr. Campagna only discussed his view of the optimal driving time between residences and acknowledged it was subjective. No one testified about a geographic limitation. The court also did not find that the limitation was in the children's best interests. The court did not explore whether there were other methods to maintain contact and, given the dysfunctional nature of the family relationships, made no finding that this limitation was necessary for the children. We therefore reverse and remand for vacation of that provision of the FJOD.

That said, however, we do not find a constitutional violation. The fifteen-mile limitation did not restrict defendant's right to

travel.  See Bisbing, 230 N.J. at 336.  He did not argue what other constitutional rights were implicated, and we decline to speculate about that issue.

C.

Defendant contends the alimony award is inconsistent with law and fact, arguing that the trial court erred in granting open duration alimony, erred in failing to address need and ability to pay alimony, and erred in failing to give him a credit toward his pendente lite arrears.

Alimony awards are not disturbed on appeal if the trial judge's conclusions are consistent with the law and not "manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice."  Foust v. Glaser, 340 N.J. Super. 312, 316 (App. Div. 2001).  The question is whether the trial judge's factual findings are supported by "adequate, substantial, credible evidence" in the record and the judge's conclusions are in accordance with the governing principles.  Ibid.; accord Gnall v. Gnall, 222 N.J. 414, 428 (2015).

Defendant asserts the alimony award should have been limited in length to no more than the marriage itself and that the trial court erred by using the parties' relationship prior to marriage as an exceptional circumstance to warrant open duration alimony. Although we agree with defendant that the parties' relationship

prior to marriage in itself was not an exceptional circumstance under N.J.S.A. 2A:34-23(c), we nonetheless agree with the trial judge that exceptional circumstances were demonstrated on this record without consideration of the pre-nuptial relationship.

"[T]he goal of a proper alimony award is to assist the supported spouse in achieving a lifestyle that is reasonably comparable to the one enjoyed while living with the supporting spouse during the marriage." Crews v. Crews, 164 N.J. 11, 16 (2000). It is "critical" and "essential" to "[i]dentify[] the marital standard of living at the time of the original divorce decree . . . regardless of whether the original support award was entered as part of a consensual agreement or of a contested divorce judgment." Id. at 25. In awarding alimony, the judge must consider the thirteen factors enumerated in N.J.S.A. 2A:34-23(b), along with any other factor deemed relevant.

N.J.S.A. 2A:34-23(c) limits the duration of alimony to the length of the marriage where the duration of the marriage is less than twenty years, unless certain "exceptional circumstances" are present. It states:

> For any marriage or civil union less than 20 years in duration, the total duration of alimony shall not, except in exceptional circumstances, exceed the length of the marriage or civil union. Determination of the length and amount of alimony shall be made by the court pursuant to consideration of all of

the statutory factors set forth in Subsection
b of this section.

[(emphasis added).]

The statute lists a number of exceptional circumstances that may

require an adjustment to the duration of the alimony including:

"4) [w]hether a spouse or partner has given
up a career or a career opportunity or
otherwise supported the career of the other
spouse or partner;

. . . .

6) The impact of the marriage or civil union
on either party's ability to become self-
supporting, including but not limited to
either party's responsibility as primary
caretaker of a child;

. . . .

8) Any other factors or circumstances that the
court deems equitable, relevant and material.

[N.J.S.A. 2A:34-23(c).]

Here, there was substantial credible evidence in this record

to support the finding of exceptional circumstances.  The court

"coupled" its decision on duration of the relationship, during

which a child was born, with plaintiff's caretaking

responsibilities for Quincy.  By all accounts, Quincy has pervasive

developmental delays.  He can be physically difficult to deal

with; he attends a special school.  Likely, special arrangements

will be needed for him after he reaches age twenty-one.  The

caretaking responsibilities "primarily belonged to plaintiff," and plaintiff has limited job availability because of her future caretaking responsibilities for Quincy and her need for retraining. She also has responsibilities for another minor child.

Defendant also contends the trial court failed to meet the requirements of the statute when it determined the amount of alimony. We discern no error. The trial court methodically and thoroughly addressed all of the factors under N.J.S.A. 2A:34-23(b). The judge considered the parties' case information statements,[7] their testimony about lifestyle and financial needs, the expert witnesses' testimony, and all of the written evidence in evaluating that the parties' lifestyle was middle class and that they would not be able to maintain this. Both parties had childcare responsibilities and responsibilities for separate households. Both were imputed income. The court's decision on the type of alimony, duration and amount was fully supported by the evidence in the record and thoroughly explored and explained by the trial judge.

Defendant contends the trial court erred in failing to give him a credit toward pendente lite arrears for July, August, September and October 2014. He testified that he deposited $2900

---

[7] Their CIS's do not reflect expenses for separate residences, because they still resided in the marital home during the trial.

into their joint account for the July 2014 payment. Plaintiff testified she may have received this in July but it was for June 2014. Defendant acknowledged that he did not pay $2900 per month for August, September, or October, but testified about credit card payments that he made and amounts that he said he deposited and then she withdrew. These were for Schedule C expenses. The court's opinion held that defendant had not proven he was not in arrears for $8700, but gave no other explanation.

The court did not explain why it concluded that defendant did not prove he paid a portion of the arrears. See R. 1:7-4(a). Certainly, he did not follow the court's order by paying the monies to plaintiff, but his unrebutted testimony was that he did pay a portion of the Schedule C expenses.[8] It is not clear why a credit

---

[8] Below is a table of his payments. For the entries from August 2014 to October 2014, defendant testified that he deposited funds that plaintiff withdrew.

| Amount | Type | Date |
|--------|------|------|
| $2900 | Deposit | July 2014 |
| $125 | Chase Credit Card | July 2014 |
| $125 | Chase Credit Card | August 2014 |
| $247 | Macy's Credit Card | August 2014 |
| $93 | Macy's Credit Card | September 2014 |
| $853.68 | Wells Fargo Loan Payment | July 2014 |
| $108 | Wells Fargo Credit Card | July 2014 |
| $125 | Chase Credit Card | September 2014 |
| $103 | Wells Fargo | October 2014 |
| $93 | Macy's Credit Card | October 2014 |
| $200 | Deposit/Withdrawal | August 2014 |
| $142 | Deposit/Withdrawal | August 2014 |

was not given.  We reverse this aspect of the FJOD and remand for the entry of an order that credits defendant's arrears for the months of August, September and October 2014, which totaled $8700, with $4,429.68, which reflected his testimony.

D.

Defendant contends the trial court's child support orders were incorrect.  He argues the trial court's child support order is inconsistent with its ruling and the trial court erred in directing the parties to share in the costs of extracurricular activities.

The trial court's "[child support] award will not be disturbed unless it is manifestly unreasonable, arbitrary, or clearly contrary to reason or to other evidence, or the result of whim or caprice."  J.B. v. W.B., 215 N.J. 305, 326 (2013) (quoting Jacoby v. Jacoby, 427 N.J. Super. 109, 116 (App. Div. 2012)).

Here, there is an error because the child support order is not consistent with the FJOD.  The order required defendant to pay $31 per week in child support to plaintiff while the FJOD required

| $150 | Deposit/Withdrawal | September 2014 |
| $150 | Deposit/Withdrawal | September 2014 |
| $150 | Deposit/Withdrawal | October 2014 |
| $150 | Deposit/Withdrawal | October 2014 |
| $165 | Deposit/Withdrawal | October 2014 |
| $1450 | Deposit/Withdrawal | October 2014 |
| **$4,429.68** | | |

plaintiff to pay that amount of child support to defendant. We remand this issue to the trial court for entry of an order correcting the September 21, 2016 child support order to be consistent with the FJOD.

Defendant also contends that the trial court erred in deviating from the child support guidelines by directing them to share equally the children's expenses for extracurricular activities. The FJOD ordered that the parties share equally the "costs of summer camp, school uniforms, children's lessons and sports, and other extracurricular activities." The court calculated child support using the Child Support Guidelines. Typically, school uniforms, lessons or instructions and sports admissions are included within the child support amount. However, the guidelines can be adjusted to "accommodate the needs of the children or the parents' circumstances." The reason for the deviation is to be specified. Child Support Guidelines, Pressler & Verniero, Current N.J. Court Rules, Appendix IX-A(3) to R. 5:6A (2018).

The trial court did not abuse its discretion in ordering that the extracurricular expenses be divided evenly between the parties. Although some of these may have been included within the Guidelines, here, the parties' incomes were imputed and equalized through the payment of alimony, each paid little in child support

29

because of that equalization, and both were the PPR for minor children, all of whom presumably will have extracurricular expenses. On these facts, we cannot say the court misapplied its discretion in requiring the parties to share these expenses.

Defendant contends that the court erred by not awarding him a Mallamo credit, pursuant to Mallamo v. Mallamo, 280 N.J. Super. 8, 12 (App. Div. 1995). In Mallamo, we held that a retroactive modification of pendente lite child support after a full trial did not violate N.J.S.A. 2A:17-56.23. Here, defendant has not shown why he would be entitled to a retroactive Mallamo credit.

E.

Defendant contends the trial court erred in awarding equitable distribution. He argues the trial court should not have restricted the sale of the marital residence until the youngest child graduated high school; erred in directing the sale of property allegedly titled to his mother; erred in including defendant's post-complaint assets in distribution; erred in directing that plaintiff's credit card debt be paid jointly from marital assets; and erred in failing to credit debt toward the business properties.

We review a trial judge's decisions concerning the allocation of assets for equitable distribution for abuse of discretion. See Williams v. Williams, 59 N.J. 229, 233 (1971); Borodinsky v.

30                                                          A-0830-16T1

Borodinsky, 162 N.J. Super. 437, 443-44 (App. Div. 1978). "The goal of equitable distribution . . . is to effect a fair and just division of marital assets." Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004). "In going about this task, the court must decide what specific property each spouse is eligible to receive by way of distribution; the value of such property for purposes of distribution; and how such allocation can most equitably be made after analysis of the factors set forth in N.J.S.A. 2A:34-23.1." Sauro v. Sauro, 425 N.J. Super. 555, 572-73 (App. Div. 2012). The determination need only reflect that the "trial judge . . . appl[ied] all the factors set forth in N.J.S.A. 2A:34-23.1 and distribute[d] the marital assets consistent with the unique needs of the parties." DeVane v. DeVane, 280 N.J. Super. 488, 493 (App. Div. 1995).

For an asset to be subject to equitable distribution, it must be "property . . . legally and beneficially acquired by [the parties] or either of them during the marriage." Orgler v. Orgler, 237 N.J. Super. 342, 350 (App. Div. 1989) (alterations in original) (quoting N.J.S.A. 2A:34-23). N.J.S.A. 2A:34-23 requires the court, in making an equitable distribution of marital property, to consider the contribution of each party to the acquisition, dissipation, preservation, depreciation or appreciation in the amount or value of marital property.

The court did not abuse its discretion in ordering that the marital home did not have to be sold until Jane graduated high school.  Where sale of the marital home is delayed, the final decision "should recognize (1) a fair return for delayed realization, (2) or an equity interest, and (3) the extent of each party's contribution to the protection and enhancement of the asset prior to sale."  Daly v. Daly, 179 N.J. Super. 344, 350-51 (App. Div. 1981).

Here, there was expert testimony by Dr. Campagna about the need to retain the marital home, if financially feasible, for the children's stability.  The court ordered that the parties had a fifty percent equity interest in the property and were entitled to fifty percent of the net proceeds upon sale when Jane graduated high school.  However, the court did not clarify which party would pay for maintenance and expenses, an issue that requires clarification.  We remand that issue to the trial court for clarification and the entry of a supplemental order.

Defendant contends the trial court erred by ordering the sale of the property where his mother was residing, arguing that the title was transferred to her before the divorce complaint was filed, his mother is not a party to the litigation, and the court erred by requiring him to prove the asset was exempt from equitable distribution.  The court found that defendant dissipated this

marital asset and that the transfer "was conducted without [p]laintiff's knowledge or consent, even though the property was purchased with marital funds."

There was no misapplication of discretion or legal error here. There was no dispute that this property was purchased during the marriage with marital funds, making the house subject to equitable distribution. It was defendant's burden to show that the property was exempt. See Painter v. Painter, 65 N.J. 196, 214 (1974) (providing that the burden of showing that an asset is exempt from equitable distribution rests with the party claiming the exemption); Weiss v. Weiss, 226 N.J. Super. 281, 291 (App. Div. 1988). The record supported the court's order. The court found plaintiff was not aware of the transfer and did not consent to it. Defendant did not produce a deed that showed the transfer. The court found that defendant was "evasive" when testifying about said property.

Defendant claims that the FJOD should not have included two post-complaint assets in the property to be distributed. These include a Wells Fargo bank account and a retirement account from a post-complaint employer, Ophthotech. "[F]or purposes of equitable distribution of marital assets, a marriage is deemed to end on the day a valid complaint for divorce is filed that commences a proceeding culminating in a final judgement of

33

divorce." <u>Portner v. Portner</u>, 93 N.J. 215, 225 (1983). In this case, the complaint was filed April 1, 2014.

As for defendant's Wells Fargo account that he claims to have acquired post-complaint, the trial court found that "[t]here was no testimony other than that these were all accounts acquired during the marriage." It was defendant who bore the burden of proving that this asset was immune from equitable distribution.

Defendant testified he lost his employment with Merck in March 2014, shortly before the divorce complaint was filed. He received a $50,000 severance amount either in April or May 2014. The court was correct to order that plaintiff was entitled to fifty percent of this amount because his employment with Merck ended prior to the divorce and the severance amount was earned then, even if paid later.

After the complaint was filed, defendant was employed by Ophthotech from August 2014, to when he elected to terminate his employment with the company rather than take one of the other employment options it offered him. Assets he acquired from Ophthotech were not marital assets subject to equitable distribution. To the extent the court ordered their equitable distribution, this was error. We remand to the trial court the issue of excluding any Ophthotech assets from the FJOD.

34

Defendant contends the trial court erred in directing that plaintiff's credit card debt be paid from marital assets, arguing that it was acquired by her post-complaint in lieu of using the pendente lite support to pay Schedule C expenses. Plaintiff testified she had to take out a credit card during the divorce to cover Schedule C expenses.

The judge's order to use marital assets to pay off this debt is not supported by sufficient credible evidence. Plaintiff acquired the credit card debt after the complaint was filed. Although defendant acknowledged that he did not pay the pendente lite support as ordered, the court did not make any findings that defendant's required payment of $2900 was not adequate to cover the Schedule C expenses. Defendant is responsible to pay the pendente lite arrears less the appropriate credit. If plaintiff's credit card debt were to be paid from marital assets, defendant would be paying again for the Schedule C expenses without any support in the record for this additional payment.

Defendant contends the trial court erred in failing to treat loans from his mother as part of the debt to be distributed. However, the court found those loans were "sham loans that exist on paper only," as "there was no proof of the purpose of the loans." Here, the record supported the court's findings; it did

not abuse its discretion by ordering that defendant is solely responsible for the "loans" from his mother.

### F.

Defendant contends the trial court should not have required him to provide $350,000 in life insurance to secure the alimony obligation, because the amount was too large, or $250,000 for his child support obligation without also ordering the same for plaintiff. N.J.S.A. 2A:34-25 provides, "[n]othing in this act shall be construed to prohibit a court from ordering either spouse or partner to maintain life insurance for the protection of the former spouse, partner, or the children of the marriage or civil union in the event of the payer spouse's or partner's death." This statute authorized the court to require defendant to carry life insurance to secure his obligations for alimony and child support. The amount was not unreasonable given the duration of the alimony, age of the parties, age of the children, and Quincy's disabilities. That the court also could have ordered plaintiff to carry life insurance for Edward does not mean that it committed reversible error by not doing so, particularly given plaintiff's financial situation and responsibilities at the time the FJOD was entered.

### III.

Plaintiff filed a cross-appeal contending that the court should not have divided the marital property evenly and she should

36

have received an award of attorney's fees. Although a court is not required to divide assets evenly, it may do so. See Rothman v. Rothman, 65 N.J. 219, 232 n.6 (1974). Here, there was ample evidence that the parties' finances going forward was not sufficient to meet their marital lifestyle. Given this financial picture, the court did not abuse its discretion in equalizing the parties' finances for the future.

Plaintiff argues the court erred by not awarding her counsel fees. The assessment of attorney's fees is an issue left to the sound discretion of the trial court. Tannen v. Tannen, 416 N.J. Super. 248, 285 (App. Div. 2010). "We will disturb a trial court's determination on counsel fees only on the rarest occasion, and then only because of clear abuse of discretion." Strahan v. Strahan, 402 N.J. Super. 298, 317 (App. Div. 2008). Here, the court properly analyzed the factors under Rule 5:3-5(c) and RPC 1.5 in determining not to award counsel fees, and its decision is fully supported by the credible evidence.

Affirmed in part; reversed in part and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION