**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3990-18

A.J.V.,

    Plaintiff-Appellant,

v.

M.M.V.,

    Defendant-Respondent.

_____

Argued April 27, 2021 – Decided May 14, 2021

Before Judges Fisher, Gilson and Gummer.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Morris County, Docket No. FM-14-1402-14.

Karin Duchin Haber argued the cause for appellant (Haber Silver & Simpson, attorneys; Karin Duchin Haber and Jane B. Simpson, of counsel; Jani Wase Vinick, on the brief).

Mark H. Sobel argued the cause for respondent (Greenbaum, Rowe, Smith and Davis LLP, attorneys; Mark H. Sobel, of counsel and on the brief; Lisa B. DiPasqua, on the brief).

PER CURIAM

The parties to this matrimonial action were married in October 1996 and have one child. Both plaintiff A.J.V. (Alan[1]) and defendant M.M.V. (Martha) have college degrees and have worked in the pharmaceutical industry. After a twenty-two-day trial, Judge Noah Franzblau rendered a 117-page written decision, which included twenty pages of thorough and thoughtful credibility findings, and entered a judgment of divorce.

In this appeal, Alan seeks review of certain portions of the judgment of divorce, arguing the trial judge erred or abused his discretion: (1) in including a $5,000 monthly savings component in his eleven-year obligation to pay Martha $11,500 per month in limited durational alimony; (2) by imposing a Mallamo[2] adjustment – based on the alimony savings component – because that component was absent from the pendente lite support order; (3) in the manner in which he distributed restricted stock units Alan received as part of his compensation from his employer; and (4) in allowing Alan less parenting time than he enjoyed during the pendente lite stage. Because the trial judge's extensive factual

---

[1] We use fictitious names to avoid any unnecessary invasion of the parties' privacy and because of the child-related issues.

[2] Mallamo v. Mallamo, 280 N.J. Super. 8 (App. Div. 1995).

findings are supported by substantial credible evidence and because his legal conclusions comport with applicable law, we affirm the judgment of divorce in all respects.

I

The following general circumstances inform the trial judge's alimony rulings.

Alan worked at the same pharmaceutical company throughout most of the marriage; he has been the company's head of global pricing for its oncology unit since 2006. Martha worked at three different pharmaceutical companies during part of the marriage but left her job in 2006 to care full time for their newly-born and only child, Stephen.

After they married, the parties initially lived in a condominium unit owned by Alan, but they later purchased a home in Flanders for $312,000. In 2004, after Alan received a promotion, the parties sold their Flanders home and purchased a home in Montreal. Another promotion two years later necessitated their move back to New Jersey; they then purchased a $1.3 million-dollar, 5,000-square-foot home in Chester.

Alan was the primary wage earner during the marriage. His W-2 wages for the years 2012 through 2018 were: $1,022,923 in 2012; $962,465.81 in

3

2013; $784,786.84 in 2014; $832,694.32 in 2015; $971,793.45 in 2016; $841,562.01 in 2017; and $633,606.20 in 2018.  Alan also received short-term cash incentives in the form of annual bonuses and long-term incentives awarded yearly in the form of restricted stock units (RSUs).  According to Alan, his employer calculated employee compensation differently depending on whether the employee's position was part of the Corporate Executive Group (CEG).  He testified that in or around 2010, his position was considered part of the CEG, resulting in the employer's calculation of his short-term and long-term incentives so that he received greater compensation.

In 2011 or 2012, Alan was working as the head of a particular operation that was not part of the CEG, but his compensation in that role was "grandfathered" under the CEG framework through 2012.  From 2013 forward, the employer calculated Alan's short-term and long-term incentives outside of the CEG framework so that his compensation generally decreased.  But in 2017, Alan received a supplemental, one-time cash payment of $158,800, which he claimed represented "three years of transition payments" for 2014, 2015, and 2016 that were supposed to have been paid to him during those years.

Martha earned substantially less than Alan during the marriage and, as noted, left the workforce after Stephen was born.  She began working as a

pharmaceutical sales representative just before the parties married, earning between $40,000-$50,000 per year plus bonuses. In 1999, Martha obtained employment as a market researcher earning around $60,000 per year, and she later worked for another pharmaceutical company until 2004, when the parties moved to Canada due to Alan's promotion. She had some difficulty obtaining employment in Canada.

When the parties moved back to New Jersey in 2006, Martha returned to work at a pharmaceutical company that had previously employed her; she was then earning approximately $140,000 per year and received multiple one-time bonuses in 2007 that increased her earnings to approximately $187,000. She left that position in November 2007.

In February 2014, on learning Alan had engaged in adulterous affairs, Martha moved out of the marital home with Stephen to an extended-stay hotel and later to an apartment in Somerset. She put most of the marital home's furniture into storage and removed $22,000 in cash from Alan's gun safe, leaving behind a letter from her attorney advising she wanted a divorce.

In November 2014, about five months after Alan filed for divorce, Martha and Stephen returned to the marital home pursuant to a pendente lite order and Alan moved to a rental home, also in Chester.

A-3990-18

Based on these and many other facts unnecessary to recount in full here, the trial judge ordered Alan to pay Martha limited durational alimony – for a period of eleven years – in the amount of $11,500 per month. Alan argues the trial judge abused his discretion by including in that amount a $5,000 monthly component for savings. Alan, in fact, asks this court "to exercise its original jurisdiction and determine that no savings component is needed."

"[A]limony is neither a punishment for the payor nor a reward for the payee," Mani v. Mani, 183 N.J. 70, 80 (2005), but instead constitutes an economic right arising from the marital partnership, providing the dependent spouse with "a level of support and standard of living generally commensurate with the quality of economic life that existed during the marriage," Koelble v. Koelble, 261 N.J. Super. 190, 192-93 (App. Div. 1992).

The fixing of a spousal support award is "broadly discretionary." Steneken v. Steneken, 367 N.J. Super. 427, 434 (App. Div. 2004), aff'd, 183 N.J. 290 (2005). A court may order alimony "as the circumstances of the parties and the nature of the case shall render fit, reasonable and just." N.J.S.A. 2A:34-23. "Whether alimony should be awarded is governed by [the fourteen] distinct, objective standards" – not one of which is "elevated in importance over any

A-3990-18

other" – listed by the Legislature in N.J.S.A. 2A:34-23(b). Gnall v. Gnall, 222 N.J. 414, 429 (2015).

A matrimonial judge must "make specific findings on the evidence about all of the statutory factors." N.J.S.A. 2A:34-23(c); see also Crews v. Crews, 164 N.J. 11, 26 (2000). Overall, "[t]he goal of alimony is to assist the supported spouse in achieving a lifestyle 'reasonably comparable' to the one enjoyed during the marriage." Lombardi v. Lombardi, 447 N.J. Super. 26, 37 (App. Div. 2016) (quoting Steneken, 183 N.J. at 299). Establishing the standard of living experienced during the marriage "serves as the touchstone" in the analysis. Crews, 164 N.J. at 16. Marital lifestyle is ascertained by considering "the marital residence, vacation home, cars owned or leased, typical travel and vacations for each year, schools, special lessons, and camps for [the] children, entertainment . . ., household help, and other personal services." Weishaus v. Weishaus, 360 N.J. Super. 281, 290-91 (App. Div. 2003), rev'd in part on other grounds, 180 N.J. 131 (2004). A marital lifestyle finding must be based not just on the amounts expended but ultimately what is equitable. Glass v. Glass, 366 N.J. Super. 357, 372 (App. Div. 2004).

At trial, the judge learned that the parties had their own credit cards and maintained separate checking, savings, and money market accounts during the

<span style="text-align:center">7</span>

marriage. Martha testified that Alan "didn't want . . . anything joint," although the testimony revealed there were exceptions to this general approach. For example, even before they married, the parties deposited their incomes into Alan's checking and money market accounts, which Martha could not access. Alan used his money market account to, among other things, assist with purchasing their homes and other large marital expenses, and he used his checking account to pay household bills. They also garnered significant annual income from several investment accounts, and plaintiff paid the credit card bills in full each month.

Because Martha did not have access to Alan's bank accounts, she mostly used her American Express card for day-to-day expenses, acknowledging as well that Alan would give her cash "[a]t times" if she needed it. Although Alan paid Martha's credit card bill each month, he required her to itemize the statement.

They owned a million-dollar home in Chester and a $285,000 vacation home on a farm in Pennsylvania where they spent their weekends between April and September, and they had already paid off both mortgages by the time of the separation because they were "debt adverse." The parties also vacationed elsewhere – between 2010 and 2014, they traveled with Stephen to Disney

8

A-3990-18

World during the off-season, the Bahamas, the U.S. Virgin Islands, Cape Cod, and once to Hawaii on "an award trip" – but the employer bore most of the expenses for those trips.

They did not own any luxury cars. Up until around 2017, Alan used his company car as his primary vehicle; later, when the company no longer provided him with a car, he purchased a 2017 Ford Explorer. At the time of the trial, which started in September 2018 and ended in March 2019, Martha drove a 2014 Ford Explorer and, prior to that, either a 2002 or 2003 Mercury Mountaineer or her company car when employed. They drove Fords, according to Martha, because they were able to utilize Alan's father's executive discount to purchase them. Their only debts were the automobile loans for the Ford Explorers. They also owned several recreational vehicles, including a 2012 Spyder motorcycle, a 2004 Suzuki ATV, a Polaris RZR ATV, and a Kubota tractor.

The parties accumulated more than $7 million in marital assets due to their focus on saving and investing as much money as possible. Martha testified "[s]avings was always a big part" of the marital lifestyle; they "always saved regularly, on a month to month basis, year to year," in "a continuous pattern . . . based on saving for [their] future." Alan agreed that savings was "by far the

largest component" of the marital lifestyle, acknowledging they saved $12,800 per month in 2012 and $21,250 per month in 2013.

As part of their frugal lifestyle, Martha sewed the drapes for their living room and dining room, purchased clothing for herself at the Salvation Army at Alan's suggestion, and made use of hand-me-down clothing for Stephen from friends until he was in second grade, although Martha also acknowledged she sometimes shopped at other clothing stores for herself and Stephen. The parties did not hire outside help to clean the home or to assist with childcare.

In an assessment of a marital lifestyle, courts must give due consideration to evidence of regular savings during the marriage, even if there is no concern about protecting an alimony award from future modification or cessation on the death of the supporting spouse. "The most 'appropriate case' in which to include a savings component is where the parties' lifestyle included regular savings . . . [b]ecause it is the manner in which the parties use their income that is determinative when establishing a martial lifestyle." Lombardi, 447 N.J. Super. at 39. The fact that "the payment of the support ultimately is protected by life insurance or other financial tools, does not make the consideration of the savings component any less appropriate." Ibid. Indeed, "[t]he Supreme Court has recognized the need to consider regular savings in determining a marital lifestyle

by including a line item for monthly savings in Schedule C of the case information statement parties must file in family matters." Id. at 40-41.

Based on the evidence found credible, the judge included in the limited durational alimony award a $5,000 per month savings component. We focus on this aspect because it is hotly contested and because the balance of the alimony determinations are sound and reasonable beyond question.

As noted above, a matrimonial court must give consideration to all fourteen statutory factors. Under the first – the "actual need and ability of the parties to pay," N.J.S.A. 2A:34-23(b)(1) – the judge found "the net assets subject to equitable distribution are in excess of $8 million" and that "following the sale of the parties' real estate," it was anticipated "both parties will each receive in excess of $3 million, which includes pension and retirement assets." The judge further found that "[w]hile it is expected that the equitable distribution will enable the parties to acquire separate residences, the potential interest earned on the parties' remaining equitable distribution (especially following [the] payment of legal fees) will not be sufficient to enable the parties to live a lifestyle reasonably comparable to the marital lifestyle."

As for the parties' earnings, the court found that Martha's potential future earnings, based upon an imputed gross income of $76,415 that Alan does not

challenge on appeal, "will be insufficient to enable her to meet the marital lifestyle." That said, Alan's "significant annual earnings . . . will enable him [to] maintain a lifestyle similar to that which existed during the marriage and to pay alimony in order to supplement [Martha's] lifestyle to provide her with a lifestyle similar to that which existed during the marriage."

In considering the second and third factors – the "duration of the marriage," N.J.S.A. 2A:34-23(b)(2), and the "age, physical and emotional health of the parties," N.J.S.A. 2A:34-23(b)(3) – the judge found the parties were married for seventeen-and-a-half years and were in good health.

As for the fourth factor – the standard of living established during the marital partnership, N.J.S.A. 2A:34-23(b)(4), which we have already discussed – the judge concluded that while the parties "did not live an extravagant lifestyle during the marriage," they "accumulated material assets and maintained a high standard of living." He observed that they owned a $1.3 million-dollar home in Chester, a $285,000 Pennsylvania vacation home, "furniture, including antiques, [and Alan] purchased a multitude of guns, and the parties acquired a motorcycle and recreational vehicles." They "periodically vacationed, although they preferred to vacation when it coincided with [Alan's] business travel so that the cost would be subsidized" by his employer.

The judge also found that Alan "earned significant annual income during the entirety of the parties' marriage, which was supplemented by [Martha's] more modest income during the early years of the marriage." The judge found the parties' "focus on savings, as opposed to consumption, allowed them to accelerate the pay-down of their mortgages," so that by the time this action was commenced they "owned the[ir] homes without any mortgage debt"; they had, in essence, "accumulated approximately $7.02 million of assets during the course of their marriage, and their only debt was approximately $40,000 relating to an automobile loan"; they "voluntarily elected to focus on saving for their future."

Considering the next five statutory factors, N.J.S.A. 2A:34-23(b)(5) to (9), the judge found Alan had "acquired sufficient education, training, skills and work experience to have held numerous high-level positions, including executive level jobs" and during the prior ten years, his total compensation "ranged from a high of approximately $1,691,871 in 2007 to a low of approximately $639,947.45 in 2009." He fixed Alan's average annual gross compensation from 2007 through 2018 at $750,147.89, which "would certainly enable him to maintain a marital lifestyle reasonably comparable to that which

he enjoyed during the marriage," and that "he will continue in his [present] job . . ., which will continue to pay him significant annual income."

In contrast, the judge found Martha's average annual gross earnings were $76,401 between 1994 and 2008 and that "even assuming [she] could earn this amount annually upon returning to the workforce, she would not be able to sustain a lifestyle remotely comparable to the marital lifestyle on her salary." Even though Martha was college-educated, the judge found she had been absent from the workforce for more than eleven years, and it was "unknown what, if any, additional training would be required to enable [her] to re-enter the workforce"; indeed, the judge found it was "unclear whether [Martha] can return to the pharmaceutical industry in a similar capacity or at a similar salary." In essence, the judge found Martha "sacrificed her career advancement in order to promote [Alan's] career advancement" during the marriage, as most notably evidenced by the impact on her employment due to their relocation to Canada. The judge also recognized Martha's continuous "service as a homemaker during the entirety of the parties' marriage (cooking, cleaning and maintaining the home), even when she was working full-time, and her subsequent dedication as a full-time stay-at-home mother and home-maker following [Stephen's] birth," which permitted Alan "to dedicate long hours to his career advancement." While

14

the judge recognized both parties will have responsibility for Stephen going forward, Martha will have greater responsibility under the parenting time schedule, which grants her nine overnights during every fourteen-day period.

As for the tenth factor – requiring the consideration of "[t]he equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair," N.J.S.A. 2A:34-23(b)(10) – the judge determined the parties would "receive significant assets" as part of equitable distribution. He "anticipated that equitable distribution will be paid from the sale of the parties' two residences and other liquid assets" and that because "[p]laintiff's income will not be materially required as a source to pay equitable distribution . . . his net income will be available to pay alimony."

The judge analyzed and weighed the eleventh factor – "[t]he income available to either party through investment of any assets held by that party," N.J.S.A. 2A:34-23(b)(11) – and anticipated that while "the equitable distribution will enable the parties to acquire separate residences and pay counsel fees, the potential interest earned on the parties' remaining equitable distribution will not be sufficient to enable the parties to live a lifestyle reasonably comparable to the marital lifestyle."

15

The judge lastly weighed the twelfth factor, which requires consideration of the "tax treatment and consequences" for both parties of the alimony award, N.J.S.A. 2A:34-23(b)(12), and the thirteenth, which requires consideration of the "nature, amount, and length of pendente lite support paid, if any," N.J.S.A. 2A:34-23(b)(13). The judge determined that the alimony award was not tax-deductible for Alan, would not be taxable to Alan, and that Alan had paid pendente lite support for over four years at the rate of $4,500 monthly plus defendant's Schedule A and B expenses (except automobile maintenance, fuel, and oil).

Based on his findings regarding these thirteen factors[3] that we have only briefly summarized, the judge concluded that the parties' monthly marital lifestyle was approximately $10,588, and they had an additional monthly savings component of $19,087. In fixing the alimony award, the judge reviewed Alan's earnings history, utilized $700,000 as Alan's "reasonable annual income" from employment (taxed at 38 percent), and estimated his available net income will be approximately $36,166 per month. The judge also imputed $76,415 in annual gross employment income to Martha based in part on her prior average

---

[3] N.J.S.A. 2A:34-23(b)(14) isn't a factor per se; it simply allows a court to consider "[a]ny other factors" that may be found "relevant." The judge found none here.

income and the average salary of a secondary school teacher, since she testified about looking for work as a substitute teacher.  Based on the marital lifestyle of $10,588 monthly plus a $19,087 savings component, the judge reasoned that "it will not be possible for both parties to maintain the marital lifestyle based upon their combined annual gross income of $776,415."

The judge explained that he reached the $11,500 per month alimony award by considering "the parties' respective incomes, income derived from interest on equitable distribution, and the need for each party to downsize their lifestyles, and further considering [Alan's] alimony obligation will not be tax deductible." He concluded that $6,500 per month in alimony as supplemented by Martha's imputed net income of approximately $4,000 per month "equates to and reasonably supports the prior $10,588 per month" marital lifestyle.

The judge also found that the $5,000 monthly savings component was "reasonable and appropriate based upon the history of the parties' marriage" during which they saved approximately $19,087 per month.  He recognized that "[w]hile 50 percent of the monthly marital savings component would be $9543.50 for each party . . . the savings component must decrease dramatically as a result of [Alan's] alimony obligation and his having to maintain two households."

17

In so ruling, the judge relied on <u>Lombardi</u>, 447 N.J. Super. at 39-40, for the proposition that "the most 'appropriate case' in which to include a savings component is where the parties' lifestyle included regular savings," as well as our rejection in <u>Lombardi</u> of the argument that a party receives the "savings component through equitable distribution of the parties' accounts." That contention, the judge held, "runs afoul of the rule that 'equitable distribution determinations are intended to be in addition to, and not as substitutes for, alimony awards,' which are awarded to provide for the maintenance of the marital lifestyle post-dissolution."

Alan does not dispute those findings pertaining to the marital lifestyle (including the finding that the parties saved approximately $19,087 per month during the marriage), his employment income, or the employment income imputed to Martha. Rather, he asserts "the court never quantified or counted the passive income [Martha] could be expected to earn from investment of the non-retirement assets she received in equitable distribution, as required by N.J.S.A. 2A:34-23(b)(11)" prior to setting the alimony award.[4] He presents a number of

_____

[4] Although Alan argues that the retirement assets Martha received in equitable distribution should factor into this analysis, consideration of those assets in fixing alimony is contrary to law. <u>See</u> N.J.S.A. 2A:34-23(b) (stating that "[w]hen a share of a retirement benefit is treated as an asset for purposes of

hypothetical scenarios to suggest Martha "has her own ability to save from $6000 to $10,000 per month herself" if one assumes she could obtain annual investment earnings on those assets at a rate of five percent.

Neither the alimony statute nor case law requires application of a five-percent annual return on investment income when calculating alimony, as Alan urges. The plain language of N.J.S.A. 2A:34-23(b)(11) requires a consideration of "[t]he income available to either party through investment of any assets held by that party." See Tannen v. Tannen, 416 N.J. Super. 248, 261 (App. Div. 2010), aff'd, 208 N.J. 409 (2011).

In any event, the trial judge's decision establishes that he "consider[ed]" and "assess[ed] evidence" pertaining to available investment income when calculating the alimony award, as was required. N.J.S.A. 2A:34-23(b). In ordering Alan to pay $5,000 per month as a savings component (substantially less than what was part of the marital lifestyle), the judge explained that he considered, among other factors, Martha's imputed employment income and her ability to derive income "from interest on equitable distribution." Indeed, the judge stated at various points throughout his written decision that Martha's

_____

equitable distribution, the court shall not consider income generated thereafter by that share for purposes of determining alimony").

19

ability to derive investment income from the interest on equitable distribution would be affected by her need to use part of the non-retirement, liquid assets to secure housing and to pay more than $700,000 in outstanding counsel fees. These findings are supported by the record.

In short, we agree with the trial judge and conclude that the $5,000 monthly savings component is reasonable under the circumstances – particularly given the couple's joint emphasis on regular savings as part of the marital lifestyle. Moreover, the judge's fixing of that amount certainly does not constitute an abuse of discretion because he explained the ruling in great detail and his explanation constitutes a more than reasonable or rational interpretation and analysis of all the alimony factors. The end result achieved is, in our view, "fair under the circumstances and congruent with the standards set forth in N.J.S.A. 2A:34-23." Steneken, 183 N.J. at 302.

II

Alan argues that the trial judge abused his discretion in granting Martha a Mallamo credit of $5,000 per month to make up for the absence of a savings component in the support Alan paid during the pendente lite stage. He claims the judge "arbitrarily applied the same savings rate ordered post-divorce to the

pendente lite period, without any real consideration of the parties' financial circumstances and ability to save during that time."

Pendente lite support orders are subject to modification at any time prior to entry of final judgment and credits may be awarded to adjust the support paid prior to final judgment. As we explained in Mallamo, 280 N.J. Super. at 16, pendente lite support is most often the end product of a motion without an evidentiary hearing, when the judge "is presented reams of conflicting and, at times, incomplete information concerning the income, assets and lifestyles of the litigants" and must impose an interim award that does not always reflect "a reasonably complete picture of the financial status of the parties until a full trial is conducted." Thus, later, when all the evidence is presented and weighed at trial, the judge is in a better position to fix a proper amount of support and may craft an award that is either higher or lower than the prior interim order. When, as here, it is the latter, a judge may consider awarding the supported spouse a credit to equalize the fact that the supported spouse was short-changed during the pendente lite stage; these rulings are reviewed under an abuse of discretion standard. Slutsky v. Slutsky, 451 N.J. Super. 332, 368 (App. Div. 2017).

The judge found that, while Alan's payment of Martha's Schedule A and Schedule B expenses plus $4,500 per month (approximately $9,202 in total

monthly pendente lite support) "reasonably enabled" Martha to maintain the marital lifestyle during the pendente lite stage, that award did not provide her "with any monthly savings component." In contrast, as the judge also found, Alan was able "during this same time . . . to continue saving whatever was left over" once he paid the pendente lite support each month.

To achieve an equitable result, the judge concluded that Alan owed Martha "$5000 per month from November 2014 through March 2019 (52 months), which amounts to $260,000." He also reasonably declined to apply the Mallamo credit prior to November 2014 because Martha admittedly benefited from removing cash from the parties' safe when she moved out of the marital home.

Alan's contention that the judge "arbitrarily applied the same savings rate ordered post-divorce to the pendente lite period" is simply not true. The judge gave a thorough reasoned explanation for his ruling.

It suffices to observe that Alan did not contest the judge's finding that the couple saved approximately $19,087 per month during the marriage, and there is no doubt the pendente lite award did not include a savings component. It was entirely consistent with the marital lifestyle and not unreasonable for the judge

22

to order a <u>Mallamo</u> credit in the amount of $5,000 per month, less the $22,000 Martha removed from the parties' safe when they separated.

Alan's assertion that he would not have had the ability to pay the extra $5,000 per month "without any access to his RSUs for the entire period of time in question," is also unavailing given his substantial employment income and lack of debt. Further, he testified that he continued to save each month by contributing toward his 401(k) during the pendente lite period, and he agreed that Martha was "equally entitled to the marital lifestyle," as our jurisprudence recognizes.

Finally, Alan claims the judge made a factual error in finding Alan was "sustaining two households" during the pendente lite period, and not three, by failing to recognize he was also required to pay expenses for the Pennsylvania home during the pendente lite period. His case information statement, however, reveals those expenses were relatively minimal, totaling, along with real estate taxes, homeowner's insurance, and utilities, $615 per month. Even assuming the judge overlooked these expenses rather than implicitly deeming them inconsequential, any error in that regard is harmless and should be disregarded; in short, Alan has not demonstrated such an alleged error was "clearly capable of producing an unjust result." <u>R.</u> 2:10-2.

23

# III

Regarding equitable distribution, the parties were able to stipulate the disposition of the majority of their marital assets, including their homes. But they left to the trial judge their disputed issues concerning the RSUs provided to Alan by his employer in 2012, 2013 and 2014. Alan argues the judge abused his discretion in the manner in which he distributed those RSUs. We disagree.

Prior to 2018, the employer awarded RSUs annually in January based on the prior year's performance but with a three-year vesting period at the end of which the employer deposited a net amount of shares into an investment account in Alan's name after withholding certain minimum amounts for federal and state income taxes.

The record reveals that Alan sold the 2,465 net shares that vested in 2015 and deposited the cash obtained in the money-market portion of the Fidelity RSU account. He did not sell the net shares that vested in 2016 and 2017; they remained in the Fidelity RSU account as stock shares at the time of trial.

On February 21, 2019, the last day of trial testimony, Alan's attorney told the trial judge that

> in terms of the RSUs . . . we have an agreement except for one small issue just related to taxes. Otherwise, we are completely in agreement about the RSUs.

A-3990-18

Martha's attorney later said they "tentatively . . . reached agreement as to the methodology of the calculation of what we call the coverture fraction" that would ultimately determine what portion of the tranches at issue were marital assets subject to equitable distribution and what portions were not.[5]

Their agreement to use a coverture fraction would suggest the parties presumed Martha was entitled only to a portion of the RSUs that vested post-complaint. Although not explained in the trial record, Alan's brief defines the numerator of the coverture fraction as the "number of months worked from the grant date to the date of [the divorce] [c]omplaint" and the denominator as thirty-six, representing "the total number of working months necessary from grant date to vesting date."[6]

---

[5] Generally, the use of a coverture fraction ensures that "the equitable distribution pot includes only that portion of the working spouse's labor which constitutes a 'shared enterprise'" and "also assures the employee spouse the benefits of his or her pre and post coverture labors." Eisenhardt v. Eisenhardt, 325 N.J. Super. 576, 581 (App. Div. 1999).

[6] See Sandra R. Klevan, Beyond Salary and Bonus: The Where, What and How of Complex Executive Compensation from a Divorce Perspective, 41 Fam. Advoc. 12, 12-16 (2018) (explaining that, in the context of RSUs that vest after the filing of the divorce complaint, "[t]he coverture fraction allocates the award as marital and nonmarital based on the vesting schedule, with the numerator being the time period from the date the award was granted to the cutoff date and the denominator being the period from the date of grant to the vesting date").

 A-3990-18

Martha's counsel represented to the trial judge that based on this coverture fraction, the parties agreed Martha should receive thirty-nine percent of the net shares in the tranche that vested in 2015, twenty-two percent of the net shares in the tranche that vested in 2016, and six percent of the net shares in the tranche that vested in 2017. He also confirmed that the parties disagreed about the tax rate to be utilized in determining the net value of each year's tranche. He presented the tax rates that Martha favored; Alan's attorney replied that she needed time to review those numbers to see whether they "may be in agreement" on that issue. The trial judge instructed the parties to thereafter "advise" him if they resolved that part of the case.

Immediately prior to the parties' summations in March 2019, the parties still had not agreed on a tax rate to be utilized in determining the net value of each year's tranche. On the record, Alan's attorney said that Martha's attorney had not responded to a letter sent about the RSUs and asked if there was an agreement. The reply was: "The issue is . . . the tax [rate], everything else we agree upon."

During his summation, Martha's attorney told the trial judge: "I believe we have resolved the issue of the tranches and the amount of the RSUs, and the division utilizing a coverture fraction," and the parties have "agreed . . . as to

the percentages that [Martha] is entitled to, percentages of RSUs" but they still had not agreed on the tax rate. Martha's attorney asserted the tax rates proposed by Alan would result in Martha unfairly "bear[ing] the burden of the highest progressive rate"; she preferred utilizing an average tax rate for each tranche.

Similarly, during summation, Alan's attorney stated that while the parties agreed Martha was to receive thirty-nine percent, twenty-two percent, and six percent of the net shares of the tranches that vested in 2015, 2016, and 2017, respectively, they had not agreed on the tax rate needed to determine the net value of each year's tranche.

In his decision, the judge came to the conclusion that the parties' inability to agree on the tax rates meant they had no agreement at all. The judge then went on to make detailed findings as to the sixteen statutory factors in N.J.S.A. 2A:34-23.1 and concluded that Martha was "entitled to 50% of all net RSU[s] granted to [Alan] prior to May 8, 2014" – the date Alan filed his divorce complaint – and "50% of the net remaining shares after tax withholding related to the 1/19/2012 grant (2133 shares), the 1/17/2013 grant (3049 shares), and the 1/22/2014 grant (1782 shares), which are the subject of the current dispute"; he also made Alan "solely responsible for all remaining and unpaid taxes on the RSUs to be transferred to" Martha. In considering the tax obligation, the judge

A-3990-18

considered the fact that he had awarded Alan "all outstanding [tax] refunds" from 2014 to 2017.

Alan initially argues that the judge erroneously disregarded the parties' agreement about the percentage of the three tranches of RSUs expressed on the record and, as a result, his award of fifty percent of those tranches to Martha was an abuse of discretion. Alan alternatively argues that the judge's division of the RSUs was premised on an error as to how and when they vested, and the division was inconsistent with applicable legal principles. We disagree in both respects.

A

The judge reasonably determined from what had been presented during the trial – and in light of the parties' last-minute description of their negotiations but incomplete agreement about these RSUs during their closing arguments – that in failing to resolve all aspects of that particular equitable distribution item, he was entitled to divide those RSUs and allocate the tax consequences in the manner he found most equitable. We agree.

As Judge Jayne said for this court in <u>Kupper v. Barger</u>, 33 N.J. Super. 491, 494 (App. Div. 1955) (emphasis added), while the enforcement of a stipulation is always subject to the trial court's "sound discretion and control," a stipulation

A-3990-18

of settlement should not be enforced "where there appears to have been an absence of mutuality of accord between the parties or their attorneys in some substantial particulars, or the stipulated agreement is incomplete in some of its material and essential terms." See also DeVries v. Evening J. Ass'n, 9 N.J. 117, 120 (1952) (holding that "[s]o long as negotiations are pending over matters relating to the contract, and which the parties regard as material to it, and until they are settled and their minds meet upon them, it is not a contract, although as to some matters they may be agreed"); Bistricer v. Bistricer, 231 N.J. Super. 143, 147 (Ch. Div. 1987). Considering that the parties did not present to the judge a full resolution of their dispute about the RSUs, the judge was free to conclude there was no binding agreement on any aspects of the dispute. We find no abuse of discretion in this determination.

B

We also find no abuse of discretion in how the judge divided the RSUs in question. "The goal of equitable distribution . . . is to effect a fair and just division of marital assets." Steneken, 367 N.J. Super. at 434. "Every case turns on its own facts and requires a case[-]by[-]case analysis." Barr v. Barr, 418 N.J. Super. 18, 44 (App. Div. 2011). A matrimonial judge must engage in a three-step process, which includes determinations of each spouse's eligibility for

29

distribution, the property's value, and the most equitable allocation of the property.  See Rothman v. Rothman, 65 N.J. 219, 232 (1974); see also Thieme v. Aucoin-Thieme, 227 N.J. 269, 284 n.4 (2016); Pascale v. Pascale, 140 N.J. 583, 609 (1995).

A judge must also recognize the presence of "a rebuttable presumption that each party made a substantial financial or nonfinancial contribution to the acquisition of income and property while the party was married," N.J.S.A. 2A:34-23.1, and apply the sixteen factors set forth in that statute.  In engaging this process, the judge "has broad discretionary authority to equitably distribute marital property."  Sauro v. Sauro, 425 N.J. Super. 555, 572 (App. Div. 2012).  As a result, our review of an "order pertaining to the division of marital assets is narrow," id. at 573, entailing a determination of whether the judge "mistakenly exercised [the] broad authority to divide the parties' property or whether the result reached was bottomed on a misconception of law or findings of fact that are contrary to the evidence."  Genovese v. Genovese, 392 N.J. Super. 215, 223 (App. Div. 2007).  Reversal is warranted only when the judge "clearly abused" this discretion.  Clark v. Clark, 429 N.J. Super. 61, 72 (App. Div. 2012).

After determining the parties had not reached a binding agreement on this issue, the judge made detailed factual findings about each of the sixteen statutory

factors, N.J.S.A. 2A:34-23.1, some of which are repetitive of the findings made regarding alimony already discussed.

To briefly repeat, the judge found that, during the parties' seventeen-year marriage, they maintained a high standard of living and accumulated approximately $7.02 million in assets with just $40,000 in debt due to their "focus on savings." He recognized Alan's employment generated a "significant annual income" during the entire marriage, as compared to Martha's "more modest income during the early years of the marriage." The judge properly assumed that after the divorce Alan would continue in his current job and earn at least $700,000 annually, while Martha would be expected to earn only $76,401 on average on returning to the workforce. The judge also recognized the parties would both receive "significant assets" in equitable distribution that would provide each "a lifestyle reasonably comparable to . . . the marital lifestyle."

In addition, the judge found Martha's "service as a homemaker during the entirety of the parties' marriage . . . even when she was working full-time, and her subsequent dedication as a full-time stay-at-home mother and home-maker following [Stephen's] birth" allowed Alan "to dedicate long hours to his career advancement." By comparison, the judge found "no evidence" to suggest Alan

31

had "contributed in any material way" to Martha's career advancement. In essence, he found Martha "sacrificed her career advancement" to promote and allow for Alan's career advancement, citing the fact that she repeatedly left jobs in favor of Alan's "better" jobs and his need to relocate.

In his specific findings about the RSUs in dispute, the judge found they "vested in equal tranches on the anniversary date of the initial grant" and "over the proximate three years from each grant date." The judge relied on and quoted from M.G. v. S.M., 457 N.J. Super. 286, 302 (App. Div. 2018), in holding that: (1) "[w]here an award is made [by an employer] during the marriage for work performed during the marriage, but becomes vested after the date of complaint, it too is subject to equitable distribution"; (2) "there is a rebuttable presumption the award is subject to equitable distribution unless there is a material dispute of fact regarding whether the stock, either in whole or in part, is for future performance"; and (3) "[t]he party seeking to exclude such assets . . . bears the burden to prove the stock award was made for services performed outside the marriage."

Applying these principles, the judge found the RSUs at issue were subject to equitable distribution because they were awarded for Alan's "pre-complaint work performance" as "compensation" during times when he was working and

traveling extensively and Martha was supporting those efforts by caring for their home and child. The judge also found that, "[u]nlike the plaintiff in M.G.," Alan "provided no material, objective or credible testimony or evidence, including stock plan information or testimony from corporate representatives, that the RSUs were compensation for or contingent upon future work performance." The judge, therefore, found Alan "failed to meet his burden of proof to exclude the RSUs from equitable distribution." The judge added that he "generally did not find [Alan] to be credible," and so rejected his "unsupported position that the RSUs are contingent or related to future performance."

In appealing, Alan argues the judge's disposition of these assets was based on a factual misconception that each RSU award vested gradually over three years, in three equal amounts per year – an interpretation of the evidence that was contrary to his own testimony, asserting that the RSUs vested after the end of three years, not gradually over three years. But the judge never specifically stated there was a gradual vesting of the RSUs. He instead held that the RSUs "vested in equal tranches over the proximate three years from each grant date," giving the example that the RSUs granted to Alan "in March 2011 were for 2010 performance, and they vested in equal tranches on the anniversary date of the initial grant in each 2012, 2013 and 2014." This holding was later repeated in

33

the judge's opinion, while he never said, as Alan argues, that "each RSU award vested gradually over three years, in three equal amount per year."  Regardless of how they vested, the judge was entitled to reach the conclusion that Martha was "entitled to 50% of all net RSU[s] granted to [Alan] prior to May 8, 2014" including half of "the net remaining shares after tax withholding related to" earlier RSU grants.  The judge also held Alan "solely responsible for all remaining and unpaid taxes on the RSUs to be transferred to" Martha.  In calculating the number of net shares in each tranche, the judge utilized the "actual effective federal income tax rates" Alan proposed as shown on a chart marked in evidence.  In holding Alan responsible for all the unpaid taxes, the judge considered that he had awarded Alan "all outstanding tax refunds" from 2014 to 2017 that had been held by Martha's counsel or otherwise.

The conclusions reached by the judge based on his factual findings are soundly rooted in the legal principles followed by our courts at least since Rothman and should not be second-guessed by an appellate court.  The trial judge sat through a lengthy trial and had a far better "feel of the case" as to what was a fair, just, and equitable distribution of the parties' property.

Alan also argues that the judge abused his discretion by reducing his parenting time from the extent permitted during the pendente lite stage with, in Alan's words, "no explanation and no support in the record." In particular, Alan argues the judge should not have eliminated his alternate Monday non-overnight parenting time with Stephen because the court-appointed custody expert recommended the alternate Monday parenting time be expanded to an overnight and because Martha had not objected to the July 2015 pendente lite parenting time schedule, which included the alternate Monday non-overnight parenting time. While Alan is not now seeking the expanded overnight parenting time that the expert recommended, he asks that we exercise original jurisdiction to reinstate his alternate Monday non-overnight parenting time.

Decisions concerning custody are left to a matrimonial judge's "sound discretion." Pascale, 140 N.J. at 611; Nufrio v. Nufrio, 341 N.J. Super. 548, 555 (App. Div. 2001). This discretion "connotes conscientious judgment," Higgins v. Polk, 14 N.J. 490, 493 (1954), requiring consideration of "the public policy of this State to assure minor children of frequent and continuing contact with both parents after the parents separated or dissolved their marriage," N.J.S.A. 9:2-4. The "primary consideration is the best interests" of the child, Hand v.

<u>Hand</u>, 391 N.J. Super. 102, 105 (App. Div. 2007), which includes consideration of

> the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children.
>
> [N.J.S.A. 9:2-4(c).]

When departing from the parents' agreement, a judge "must identify on the record the specific factors that justify [a different] arrangement." <u>Bisbing v. Bisbing</u>, 230 N.J. 309, 322 (2017). In his thorough written opinion, the judge explained that while the parties consented to joint legal custody, they disagreed on physical or residential custody. Alan sought a shared residential custody arrangement with each party having seven overnights during every fourteen-day period; Martha sought designation as the parent of primary residence with Alan

continuing to exercise his pendente lite parenting time schedule, which had been in place since July 2015, of five overnights during every fourteen-day period.

In relying on the court-appointed expert's unrebutted opinion, the judge concluded it was in Stephen's best interests for Martha to "be awarded primary physical (residential) custody." He cited as "important" Alan's "lack of credibility, his refusal to consent to a parenting coordinator during the course of the litigation, his general lack of involvement in [Stephen's] life prior to the parties' physical separation," and "the consistency of [Martha's] presence in [the child's] life from birth through the present time," as well as the child's "greater affinity and preference to spend more time" with Martha.

In reaching this decision, the judge considered all the factors delineated in N.J.S.A. 9:2-4 and found certain factors to be especially relevant, including: the parties "do not possess a material ability to agree, communicate or cooperate" in matters relating to the child; the child has a good relationship with, and is bonded with, both parents; the child's relationship with Alan "deepened following the parties' separation," but Stephen "continues to have a greater affinity for his mother" and an "increased comfort level" with her; Stephen, who appeared to the judge "intelligent, honest, and capable of expressing a rational opinion of desire regarding the custody issue," "expressed a consistent

37

preference to spend more time" with Martha[7]; Stephen has no special educational or medical needs; and, prior to the separation, Martha "was the [child's] primary caretaker . . . in all respects," although Alan became more involved after the separation and was managing his work schedule "to accommodate his parenting time."

The key difference between the schedule during the pendente lite stage and the schedule contained in the judgment of divorce is that the latter omitted the "alternate Mondays following [Martha's] weekend with [Stephen] from after school until 7:30 p.m." The judge did, however, add a Monday daytime visit for Alan until 6:00 p.m. on school holidays following a weekend when he had parenting time (which had not been previously ordered during the pendente lite period), provided Martha does not have parenting time for that holiday. And instead of ordering generally that the parties alternate holidays and school vacations, as the court-appointed expert recommended, the judge created a more detailed holiday schedule. He also adopted the expert's recommendation that each party have at least three weeks of summer vacation with Stephen (consisting of two consecutive weeks and one additional non-consecutive week).

---

[7] See Wilke v. Culp, 196 N.J. Super. 487, 498 (App. Div. 1984) (explaining that "the desires of older children may be entitled to stronger consideration than that afforded to younger children" on the issue of parenting time).

The judge characterized this new parenting plan as "essentially the same as the current schedule with the addition of defined holiday and vacation time." He explained that he declined to expand Alan's parenting time to include six overnights in each fourteen-day period as recommended by the court-appointed expert, citing, among many other things, the importance of a need for "consistency of the parenting schedule," Martha's "credible" testimony that Stephen "has adjusted well to the existing parenting schedule," and Stephen's expressed desire "to spend more time with his mother."

The judge's extensive factual findings are adequately supported by sufficient credible evidence, and his thorough written opinion reveals that the judge fully discharged his duty to "identify . . . the specific factors" that justified his disposition. Bisbing, 230 N.J. at 322. Alan, in arguing that the judge erred in denying him the overnight Mondays that were previously allowed during the pendente lite stage, particularly relies on the court-appointed expert's opinion that favored his position and Martha's amenability to the preexisting schedule. But even though family courts often "rely heavily" on the opinions of experts, Kinsella v. Kinsella, 150 N.J. 276, 318 (1997), the judge is always "free to accept or reject . . . and need not adopt the opinion of" an expert, Brown v. Brown, 348 N.J. Super. 466, 478 (App. Div. 2002); see also D.A. v. R.C., 438

N.J. Super. 431, 454 (App. Div. 2014). Similarly, the parties cannot by agreement or acquiescence "relieve the court of its obligation to safeguard the best interests of the child." P.T. v. M.S., 325 N.J. Super. 193, 215 (App. Div. 1999). "The burden of making and explaining that decision remains at all times the exclusive obligation of the trial judge and can never be delegated to any other party." D.A., 438 N.J. Super. at 454.

The judge reached a decision based on his assessment of the testimony and his interview of the child, thereby gaining a better "feel of the case" and a more informed view of what was fair and just in this situation than an appellate court can obtain by reviewing a transcript. We, therefore, defer to the judge's findings of fact and, after careful review, find no reason to second guess his exercise of discretion in adopting the parenting schedule.

* * *

In addition to those arguments discussed at length above, Alan argues that the trial judge abused his discretion in allocating their responsibility for Stephen's unreimbursed medical expenses and in his rulings about future college education contributions; he also argues that the judge erred in denying his motion to seal the record. We find these arguments have insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

40                                                                              A-3990-18

Alan lastly argues that if our decision necessitates any further trial court proceedings we should direct the assignment of a different trial judge or take that step notwithstanding because there may be post-judgment motions in the future. This argument is frivolous. The judge may not have viewed the facts and circumstances as does Alan but that does not mean he exceeded his authority or acted with bias toward any party. To the contrary, the judge could not have more thoroughly, carefully, and fairly considered all the issues put before him. We find no reason to question the able judge's impartiality in this hotly-contested case.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3990-18